UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

THE SCOULAR COMPANY,

        Plaintiff,

vs.

CERES GLOBAL AG CORP. and
RIVERLAND AG CORP.,

        Defendants.

Civil File No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff The Scoular Company ("Scoular"), for its Complaint against Defendants Ceres Global Ag Corp. ("Ceres Global") and Riverland Ag Corp. ("Riverland"), states and alleges as follows:

## NATURE OF THE ACTION

1.    This is an action including claims to recover for Ceres Global's breaches of contract, along with claims for unjust enrichment and promissory estoppel for its disregard of its commitments and representations on matters outside the scope of the parties' contracts.  This action also seeks to recover damages, including attorney fees, for Ceres Global's subsidiary Riverland's interference with contractual relationships.  The claims all arise out of the development of an oil and grain rail transfer facility (sometimes hereinafter referred to as the "Port") on the border between North Dakota and Saskatchewan, Canada for shipments into or through North Dakota to U.S. end users and export terminals.  Defendants repeatedly represented to Scoular that, lacking the expertise and industry relationships to develop the grain-handling portion of the Port (the "Grain

Facility") themselves, they needed Scoular to contribute substantial funds, expertise, hundreds of hours, and other resources necessary to plan, build, and operate the Grain Facility independently.  Ceres Global assured Scoular that Riverland would not interfere with Scoular's position in the project.  After receiving the benefits of Scoular's investment in the project, however, Defendants suddenly reversed course and excluded Scoular from the project by replacing Scoular with Riverland and appropriating for themselves the benefits of Scoular's work, which neither Ceres Global nor Riverland possessed the capacity or capability to accomplish themselves.  Defendants explicitly admitted that their motivation for replacing Scoular was simply that they could make more money by retaining the benefits of the project for themselves.

## PARTIES

2.     Scoular is a Nebraska corporation with one of its offices in Minneapolis, Minnesota.  Scoular is a century-old, employee-owned agricultural marketing company, managing commodity supply-chain risk for customers in food, feed, and renewable fuel markets.  It has long and significant experience planning, building, developing, and operating grain elevators and related rail transportation infrastructure.

3.     Ceres Global is a publicly-traded Canadian corporation with its principal place of business in Toronto, Ontario.  Ceres Global is a financial assets management firm with focus on grain storage and handling and commodity logistics.  Ceres Global, however, possesses no operational capabilities, employing only one or two persons during most of the times relevant to this Complaint.  During the relevant period, Ceres Global was managed by Front Street Capital, an investment management firm.

4.     Riverland is a Delaware corporation with an office in St. Louis Park, Minnesota.  Riverland is a wholly-owned subsidiary of Ceres Global, having been acquired by Ceres Global during or around June 2010.  Among other activities, Riverland has owned and operated ten or more grain elevators, including several such facilities within Minnesota.

### JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) and (a)(2) because Scoular is neither incorporated in nor has its principal place of business in the same state as either Defendant, and Ceres Global is a subject of a foreign state and the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     The Court has personal jurisdiction over both Defendants.

7.     The Court has specific personal jurisdiction over Ceres Global because Ceres Global has purposely availed itself of the benefits of conducting business in Minnesota.   Ceres Global purposely initiated contact with Scoular to solicit a business relationship with Scoular, initiated and attended multiple meetings in Minnesota with Scoular and other parties, exchanged numerous calls, letters, and emails with Scoular, and induced Scoular to enter into a business relationship with it.

8.     The Court has general and specific jurisdiction over Riverland because Riverland owns grain elevators in Minnesota, conducts substantial business in Minnesota, has an office in Minnesota, actively solicited Scoular in Minnesota, and participated in meetings with Scoular and other parties in Minnesota.

9.      Venue is proper in the District of Minnesota pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this district.  Alternatively, venue is proper pursuant to 28 U.S.C. §1391(b)(3) because Defendants are subject to the Court's personal jurisdiction in this action.

## FACTUAL BACKGROUND

10.     In 2012, Riverland, acting on behalf of itself and its parent Ceres Global, approached Scoular and proposed a meeting among Ceres Global, Riverland, and Scoular in Minneapolis, Minnesota.  The initial meeting in Minneapolis occurred at Riverland's invitation on or around June 26, 2012 and was held in Scoular's Minneapolis office.

11.     Additional meetings relating to the Northgate Project took place in or near Minneapolis and were attended by representatives of Scoular and one or both Defendants, including meetings on or around August 28, 2012 and September 18, 2012.

12.     Ceres Global informed Scoular that it had developed plans for an export-oriented commodity logistics center, including rail loops, grain elevators, oil storage facilities, and related construction along the United States-Canada border near Northgate, Saskatchewan (the "Northgate Project," initially and periodically also called "Project Corus").  Ceres Global provided Scoular with materials describing itself and outlining its plans for the project.

13.     Ceres Global, directly or through related persons or entities, had acquired about 1,600 acres of land at Northgate, Saskatchewan and about ten acres of adjacent land in North Dakota.  The size and location of the property acquisition effectively barred any other private operation from accessing the United States at this crossing via the rail

lines of the BNSF Railway Company ("BNSF").  The border crossing site is unique for its proximity to Canadian oil and grain production.

14.     The Northgate Project was expected to be only the sixth cross-border rail crossing between Western Canada and the United States and the first such border crossing to be completed in decades.  The project focuses on increased north-to-south flow of Canadian grain, railway facilities for transport of crude oil production, and transfer facilities for such related products as frac sand, pipe, and aggregates.

15.     Ceres Global informed Scoular that because Ceres Global and Riverland lacked essential internal expertise and resources, neither Ceres Global nor its U.S. subsidiary Riverland would be able to develop or, in the future, operate the proposed Grain Facility without Scoular's aid.  Unlike Scoular, Riverland has operated as a passive grain storage operation positioned to make deliveries against futures contracts rather than serve and ship to destination customers, and lacked the experience or expertise to develop or operate the high-volume, high-speed Grain Facility envisioned for the Port.

16.     Early in the parties' discussions, Scoular made clear to Ceres Global and Riverland the importance of a single operator for the Grain Facility:

> In our view, it is essential that there be a single operator for the grain facility and Scoular would be that operator, though we understand and agree on the importance of providing grain origination at wholesale values to Riverland Ag.  …  We envision being the exclusive grain operator …

17.     Following some initial debate by Riverland, the parties reached agreement that Scoular would be the sole and exclusive Grain Facility developer, owner, and operator and entered into intensive negotiations over final agreements, finalizing several

contracts and contract amendments relating to limited aspects of their relationship.
Because Ceres Global had announced that the Port was to be operating in 2013, it
emphasized an aggressive development timetable.

18.     On February 5, 2013, Ceres Global issued a press release announcing the
Northgate Project as a $90 million Commodity Logistics Hub in Saskatchewan and
confirming Scoular's role as the owner and operator of the Grain Facility.  In the press
release, Ceres Global announced the terms of its partnership with Scoular:

> The Scoular Company … is partnering with Ceres on the
> project.  Scoular will fund, own and operate the grain
> handling facility.  Ceres' grain subsidiary, Riverland Ag, will
> be a major customer of the grain facility, and will work
> closely with Scoular on the procurement of certain grains.
>
> … Ceres is delighted to have Scoular as a partner on this
> project, and to be introducing a new, major buyer of grain to
> the Canadian market.

19.     Scoular sought and obtained Ceres Global's approval for a press release
confirming its own role in the project:

> Scoular will design and pay for the entire cost of constructing
> the grain facility and will be the sole owner and operator upon
> completion.

**The Parties' Term Sheet**

20.     On or around November 15, 2012, Scoular and Ceres Global executed a
Term Sheet for the Northgate Project (together with amendments, the "Term Sheet"),
which describes certain defined aspects of the Northgate Project.  The Term Sheet
provides that Ceres Global and Scoular are to "establish and fund one or more companies
(referred to herein collectively as 'PortCo') … to undertake the overall development of

The Northgate Project."  The Term Sheet further states that Scoular and Ceres Global are

to "jointly manage and operate PortCo for a period of approximately two years."  It states

that the Agreement is to be governed by the laws of Ontario, Canada.

21.     Specifically regarding the Grain Facility, the Term Sheet provides:

> Scoular will design, engineer and construct, at its own
> expense, a grain terminal, rail loop track and private access
> roads on the Northgate Land on a basis consistent with the
> overall site plan approved by PortCo and BNSF and as
> allowed by applicable government permits.

> Scoular will work in cooperation with PortCo and other
> OpCos to design, engineer, and construct complementary
> facilities, including an oil terminal, an oil field supply facility
> and common elements, on Northgate Land when and to the
> extent that such improvements are the subject of committed
> investment and/or long-term financing.

> Scoular will lease from PortCo the land it requires for the
> Grain Facility. …

> Scoular will have sole authority to manage the business and
> operations of the Grain Facility, subject however to any
> service commitments (eg:  rail logistics, oil transloading, etc.)
> made by Scoular to other Project Corus operations.

22.     Riverland was not one of the "OpCos" referenced in the Term Sheet.

23.     The Term Sheet contains a Non-Binding Provision that emphasizes the

serious intention of Ceres Global and Scoular to take the steps needed to enter into a

definitive contract, but also notes that, with respect to a number of terms, the Term Sheet

is not intended to create binding obligations between the parties.  The Non-Binding

provision of the Term Sheet states:

> [E]xcept for the "Confidentiality" and "Exclusivity"
> provisions contained herein, which shall be binding on the

> Parties, this term sheet shall not constitute any binding agreement of the Parties … and shall not obligate any of the Parties to enter into any transaction in connection with the Project or any of the documents contemplated herein.
>
> If for any reason whatsoever the Parties fail to execute … Definitive Agreements, no Party will be entitled to make any claim to the others as a consequence of the failure by the Parties to reach an agreement.

24.     The referenced Exclusivity provision, which is explicitly described as a binding provision, states that "Ceres agrees that it will not entertain proposals or enter into discussions with parties other than Scoular pertaining to the development of a grain facility on the Northgate Land for a period coterminous with the Term of this term sheet."

25.     The Term Sheet specifically references a limited and separate role in the Northgate Project for Riverland, wholly distinct from the role allocated to Scoular: "Scoular will give Riverland Ag priority consideration for the development of identity-preserved oat storage and handling space and will give Riverland Ag 'first or last look' at cereal grains being marketed by Scoular at the Grain Facility."

26.     The Term Sheet provides that it is to extend for certain specified periods of time but then is to extend "indefinitely thereafter" unless terminated in writing by either of the parties.  The Term Sheet further provides that, if Scoular terminates the Term Sheet, then Ceres Global will no longer be obligated to comply with the "Exclusivity" provision.  Scoular did not terminate the Term Sheet, and the exclusivity provisions of the Term Sheet remained in place until January 31, 2014, shortly after Ceres Global had informed Scoular that it intended to terminate the Term Sheet along with Scoular's other rights in the Northgate Project.

## Scoular's Work on the Northgate Project

27.     At the continuous urging of Ceres and in reliance on its statements and actions consistent with such urging, Scoular advanced many millions of dollars and invested hundreds of hours of its expertise in dramatically changing the design of the Northgate Project.  These investments paved the way for mass grading to occur in 2013, thus allowing the project to move forward in 2013, and at the same time substantially improved the design of the project.

28.     During the time that Scoular worked on the project, it worked with Ceres Global's engineering consulting firm, H.R. Green, Inc.  The technical contributions of Ceres Global itself were virtually nonexistent, since Ceres Global lacked any employees capable of contributing to the physical layout and development of the Northgate Project.

29.     Instead of making technical contributions, Ceres Global provided financial contributions and indicated it would work on obtaining agreements with oil shipping entities.  Ceres Global was completely unsuccessful in obtaining such agreements, with the result that by late 2013 the only commercially viable aspect of the Northgate Project was the Grain Facility, which was to be owned and operated by Scoular.

30.     Scoular's contributions to the Northgate Project included advice resulting in millions of dollars in cost reductions, redesign of rail track layout, removal of unnecessary costs, and reductions of excess infrastructure, resulting in an operationally sound and financially feasible Port design and layout.

31.     Throughout the period of Scoular's involvement in the Northgate Project, it used its reputation and relationship with BNSF to further the project.  Specifically, the

BNSF constructed a new track extension leading to the Canadian border because it had confidence in Scoular's business plan, a plan that would generate a high volume of rail traffic on long-haul routes and thus generate substantial freight revenue to offset the BNSF investment. The track extension was completed in 2013 but would not exist in its current form but for Scoular's expertise, reputation, and specific recommendations. Moreover, BNSF undertook to secure approvals and service commitments from the U.S. Department of Homeland Security for the Northgate Project with Scoular's support and business plan as justification, without which the rail border crossing might not even be feasible.

32. Specifically, the design and construction of the Port was modified through the contributions of Scoular so as to be scalable over time, allowing for investment to be metered based on the type and volume of business that would come to the Port. This phased development reduced the investment and resulted in an economically viable project from the commencement of operations, yet did not preclude future expansion to full-scale industrial operations when larger volumes of business might justify such expansion. The Grain Facility was designed by Scoular at its own expense to be equipped to load 120-car shuttle trains, while the oil and oil supply businesses appeared to require far less infrastructure than originally designed by Ceres Global.

**The Parties' Shared Costs Agreement**

33. Ceres Global had previously announced to its public investors that the Port at the Northgate Project would commence initial operations in the fall of 2013. The timetable that Ceres Global had announced was not feasible. The construction season in

Saskatchewan is very short.  The aggressive timetable for completion that Ceres Global had announced, even though not achievable, compelled the commencement of preliminary work, particularly grading work, in late spring 2013, to retain the hope of the lead track, the access roads, and other infrastructure essential to Port operations being constructed in 2014.  This initial construction phase was expected to cost many millions of dollars, and Ceres Global was concerned that the poor financial performance of its subsidiary Riverland, among other factors, could prevent Ceres Global from being able to finance this initial phase of work alone.

34.     For those reasons, Ceres Global asked Scoular to add to Scoular's non-financial contributions and sole responsibility for the Grain Facility by committing millions of dollars for construction of the Port.  On or around May 31, 2013, Ceres Global and Scoular entered into a cost-sharing contract ("the Shared Costs Agreement"), the limited purpose of which was to set out the terms upon which Ceres Global and Scoular would share, on an equal basis, costs and taxes related to mass grading activities necessary for the construction of the lead track, the access roads, and other infrastructure essential to any Port operations.  Ceres Global was the principal drafter of the Shared Costs Agreement, which states that it is to be governed by the laws of Ontario, Canada.

35.     The Shared Costs Agreement contains, among other provisions, specific commitments relating to cost-sharing for mass grading activities, a right of first refusal related to the Grain Facility for Scoular, and a reimbursement provision.

36.     The right of first refusal provision provides, in relevant part:

3. … For a period … expiring on the third anniversary of the Effective Date …, if Ceres or an affiliate thereof (in this Section 3, "Ceres"), proposes to enter into any binding commitment with any party other than Scoular without Scoular's prior consent, to design, build, and/or operate any grain facility or other facility for the conduct of Grain Activities… on Project Lands (the "Proposed Transaction"):

(a) Ceres shall deliver a notice of the Proposed Transaction to Scoular (the "Proposed Transaction Notice"), which shall contain the material terms and conditions (including the price and form of consideration, but excluding the identity of the Offeror) of the Proposed Transaction;

(b) Scoular may enter into a binding commitment with Ceres on the terms and conditions set forth in the Proposed Transaction Notice (subject to Section 3(d)) by delivering notice thereof to Ceres within 30 days of receipt of the Proposed Transaction Notice; and

(c) if Scoular does not agree to enter into a binding commitment with Ceres on the terms and conditions set forth in the Proposed Transaction Notice, then following the expiry of the 30-day acceptance period, Ceres will be free to enter into the Proposed Transaction on the terms and conditions set forth in the Proposed Transaction Notice within 90 days following the expiry of the 30-day acceptance period.  On and after the closing of the Proposed Transaction, Scoular will be relieved of any further responsibility for the Shared Costs.

37.     The Shared Costs Agreement also contains a Reimbursement Notice

provision, which provides:

For a period … expiring on the third anniversary of the Effective Date …, if Ceres constructs or causes to be constructed on the Project Lands any improvement that is substantially inconsistent with [a specified] Design and/or the Term Sheet, then Scoular is entitled, by delivering notice thereof to Ceres (the "Reimbursement Notice") to be reimbursed the Shared Costs paid by Scoular …

**Ceres Global's Attempted Termination of Scoular's Rights**

38.     Up through 2013, Ceres Global's largest business was its Riverland business.  Riverland, however, was performing poorly, and its existing business had little or no viable future.  As a result, Ceres Global faced the prospect of selling the Riverland assets at a loss or continuing to incur operating losses, in either case depleting its financial resources.  Indeed, during or around August 2013, Ceres Global engaged an investment banking firm to put Riverland or its assets up for sale.  With the weakness of its Riverland business, Ceres Global decided to change its focus and to substitute Riverland for Scoular in the Northgate Project so that Riverland, and through Riverland, Ceres Global, would reap the benefit of Scoular's contributions.

39.     In November 2013, following intensive negotiations, a Term Sheet Addendum and an Amendment and Consent Agreement were finalized, signaling substantial commitments by both parties.  Scoular executed the finalized documents.

40.     After Scoular had executed what it understood to be the finalized Term Sheet Addendum and an Amendment and Consent Agreement, Ceres Global's Chief Executive Officer Michael Detlefsen informed Scoular that he had been instructed not to sign the agreements.

41.     On or around January 28, 2014, after Scoular had made its huge investment of money, time, and expertise, Ceres Global informed Scoular orally that Ceres Global had decided to terminate the Shared Costs Agreement and the Term Sheet.  Ceres Global informed Scoular that it intended to pursue the Northgate Project by engaging Riverland to perform the role that Ceres Global had promised Scoular it would have, the role that

their agreements allocated to Scoular, to "design, build and/or operate [the] grain facility." Ceres Global reported that its Board of Directors had "reviewed Northgate last week and found the case compelling," including the "[d]ownstream value." It reported that decision as the unanimous decision of its seven-member board of directors.

42.     Ceres Global's January 28 oral message was followed by a January 31, 2014 written termination notice.

43.     Ceres Global stated directly to Scoular in writing on January 31, 2014 that "[a]fter almost two years of rowing in one direction, it is not easy to completely reverse course. However … our new Board … wants us to try to capture the upside of the Northgate Grainco."

44.     Ceres Global stated publicly at that time that "we looked at the relative economics, and decided that the option of doing it ourselves generated higher value for Ceres Global's shareholders than the current Scoular deal that was on the table."

45.     In short, Ceres Global decided to attempt to free itself of its contractual and other obligations to Scoular so as to enrich Riverland and itself. Conspicuously, Ceres Global reached this decision only after Scoular had accomplished much that neither Ceres Global nor Riverland could have accomplished without Scoular. Scoular's contributions were an indispensable component of the Northgate Project's viability.

46.     Ceres Global has never provided Scoular the contractually-mandated Proposed Transaction Notice. Scoular has not exercised its option to submit a formal Reimbursement Notice.

47.     To date, Ceres Global has refused to reimburse Scoular for the funds Scoular invested pursuant to the Shared Costs Agreement unless Scoular waives all its other rights, including its right of first refusal and its right to fair reimbursement for its contributions to the Northgate Project.  Ceres Global thus seeks to force Scoular either to acquiesce to Ceres Global's demands or to forfeit what it has contributed to the Northgate Project and the anticipated business opportunity to which it is entitled.  Ceres Global's position amounts to a demand that Scoular convert its cash contributions into interest-free loans, and that it walk away from its right of first refusal and the millions of dollars in value it contributed to development of the Northgate Project through its time, expertise, and relationships with other parties, including BNSF.

48.     More recently, Ceres Global has begun to sell off Riverland assets that retain some market value in an effort to raise capital for the 2014 construction season.  Ceres Global has also decided to attempt to raise capital from third parties to allow the development to go forward.  Both the attempted substitution of Riverland for Scoular and the possible introduction of other third party investors violates Scoular's rights.

49.     Part of the harm that Ceres Global's precipitous exclusion of Scoular from the Northgate Project has caused Scoular is the loss of valuable Scoular rights under a contract with BNSF.

## COUNT I
## (BREACH OF SHARED COSTS AGREEMENT BY CERES GLOBAL)

50.     Scoular incorporates by reference each of the preceding paragraphs as if set forth here.

51.     By their explicit terms, Scoular's right of first refusal set out in ¶3 and its reimbursement right set out in ¶4 of the Shared Costs Agreement remain binding and intact until May 31, 2016.

52.     Ceres Global breached the Shared Costs Agreement in at least two respects.

53.     On information and belief, Ceres Global has entered into an agreement with Riverland, likely unwritten, "without Scoular's prior consent, to design, build, and/or operate a grain facility on the Project Lands."  Riverland is a party specifically referenced in the Term Sheet, which is incorporated into the Shared Costs Agreement.  It is a "party other than Scoular" under the Shared Costs Agreement.

54.     Because the Shared Costs Agreement creates no exclusion for Ceres Global to transfer Scoular's rights to its own subsidiary, Scoular's receipt of Ceres Global's notification of termination of Scoular's rights gives rise to Scoular's right of first refusal.

55.     Ceres Global's proposal to have Riverland become the developer will also result in the improvement on site being "substantially inconsistent … with the Term Sheet," since, among other inconsistencies, the Term Sheet provides for Scoular to be the owner, designer, and operator of the Northgate Project.  That inconsistency also gives rise to Scoular's reimbursement rights.

56.     Ceres Global's refusal to deliver the Proposed Transaction Notice is a material breach of the Shared Costs Agreement.  Ceres Global's refusal to offer to return Scoular's financial contributions to grading work without conditions is also a material breach of the Shared Costs Agreement.

57.     Nothing in the Shared Costs Agreement or in Scoular's actions justifies Ceres Global's breaches of material provisions of the Shared Costs Agreement.

58.     Scoular has been significantly damaged, in amounts to be proved at trial, by Ceres Global's breaches.

## COUNT II
## (BREACH OF TERM SHEET BY CERES GLOBAL)

59.     Scoular incorporates by reference each of the preceding paragraphs as if set forth here.

60.     Ceres Global's actions excluding Scoular from the Northgate Project and instead giving Scoular's place in the project to Riverland are material breaches of the binding exclusivity provisions in the Term Sheet.  Specifically, the Term Sheet commits Ceres Global not to "entertain proposals or enter into discussions with parties other than Scoular pertaining to the development of a grain facility on the Northgate Land for a period coterminous with the Term of this sheet."

61.     On information and belief, Ceres Global entertained at least one proposal, entered into discussions, and reached an agreement with Riverland, a "party other than Scoular," pertaining to the development of a Grain Facility on the Northgate land while the Term Sheet remained effective.

62.     Nothing in the Term Sheet or in Scoular's actions justifies Ceres Global's breach of this material provision of the Term Sheet.

63.     Scoular has been significantly damaged, in amounts to be proved at trial, by Ceres Global's breach of the exclusivity provision of the Term Sheet.

## COUNT III
## (INTERFERENCE WITH CONTRACT BY RIVERLAND)

64.     Scoular incorporates by reference each of the preceding paragraphs as if set forth here.

65.     As a wholly-owned subsidiary of Ceres Global with extensive knowledge of the Northgate Project, Riverland was fully aware of the terms of the Shared Costs Agreement and the Term Sheet.

66.     In participating in, and perhaps even initiating, Ceres Global's participation in "proposals or … discussions with parties other than Scoular pertaining to the development of a grain facility on the Northgate Land for a period coterminous with the Term of [the Term Sheet]," Riverland intentionally interfered with Scoular's rights under the exclusivity provision of the Term Sheet and Scoular's right of first refusal under the Shared Costs Agreement.  It intentionally procured Ceres Global's breach of those agreements.

67.     Nothing in the Term Sheet or in Scoular's actions justifies Riverland's interference with those material provisions of the Term Sheet and the Shared Costs Agreement.

68.     Scoular has been significantly damaged by Riverland's interference with contract in amounts to be proved at trial, including its attorney fees incurred in connection with this litigation and related events.

## COUNT IV
## (PROMISSORY ESTOPPEL AGAINST CERES GLOBAL)

69.     Scoular incorporates by reference each of the preceding allegations as if set forth here.

70.     Wholly apart from specific commitments in the Term Sheet and the Shared Costs Agreement, Ceres Global promised Scoular that it would be an active partner in the Northgate Project and that it would be the developer, owner, and operator of the Grain Facility within the project.  On multiple occasions, Ceres Global explicitly committed to Scoular that Riverland would not interfere with Scoular's work and rights.  Specifically, for example, in the fall of 2012, Scoular informed Ceres Global that it was not willing to invest its resources in the Northgate Project if Riverland were involved in operation of the Grain Facility.  In response, Ceres Global's Chief Executive Officer, Michael Detlefsen, explicitly assured Scoular that he would ensure that Riverland would not interfere with Scoular's work and rights.

71.     The language of the Term Sheet informed Scoular that it could not assume that final agreements would be reached in any specific form.  Ceres Global's assurances did, however, persuade Scoular - as Ceres Global intended - that the benefits of Scoular's many months of work would not flow to Ceres Global's subsidiary Riverland.

72.     Ceres Global led Scoular to believe that Scoular would receive the benefits of its efforts.

73.     Ceres Global reasonably expected that its promises would induce Scoular to invest time, money, and other resources into developing the Northgate Project.

74.     Since 2012, in reliance upon commitments by Ceres Global, Scoular has provided millions of dollars' worth of technical assistance on design, engineering, construction, and operational issues involved in the Northgate Project.

75.     In reliance upon commitments made and repeatedly reinforced by Ceres Global, Scoular has effectively lent its proprietary relationship with BNSF to the Northgate Project and used its expertise, reputation and resources to provide vital support to the Northgate Project.

76.     A significant part of the progress made on the Northgate Project to, and indeed its current viability, could not have been achieved by Ceres Global and Riverland acting alone but rather are the result of Scoular's contributions in these and numerous other ways.

77.     Scoular reasonably acted in reliance on Ceres Global's promises.

78.     Scoular's actions and investments, based on reliance on Ceres Global's promises, are separate and distinct from the provisions of either the Term Sheet or the Shared Costs Agreement.

79.     Justice requires enforcement of Ceres Global's promises, and recovery of Scoular's investment in reliance on those promises.

## COUNT V
### (UNJUST ENRICHMENT AGAINST BOTH DEFENDANTS)

80.     Scoular incorporates by reference each of the preceding allegations as if set forth here.

81.     The promises of Ceres Global, entirely apart from specific commitments in the Term Sheet and the Shared Costs Agreement, reasonably led Scoular to believe that Scoular would receive benefits from its efforts.

82.     Scoular's actions conferred benefits upon Ceres Global and Riverland because they have effectively appropriated the value of millions of dollars of tangible and intangible work that Scoular has poured into the Northgate Project through its monetary investment, expertise, relationships, and other efforts.

83.     Ceres Global has publicly acknowledged that it took its actions to exclude Scoular simply in order to keep more profits for itself and its Riverland subsidiary.

84.     Allowing Ceres Global and its subsidiary Riverland to retain the benefits of Scoular's work would unjustly enrich both Ceres Global and Riverland and would be inequitable.

85.     Absent payment of amounts to be proved at trial, Scoular will be damaged by Defendants' unjust enrichment and would have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Scoular requests that this Court enter a judgment and decree against Ceres Global and Riverland as follows:

a)      Temporary, preliminary, and permanent injunctive relief against Ceres Global and Riverland to prevent them from abrogating Scoular's right of first refusal;

b)      Judgment against Ceres Global for damages in amounts to be determined at trial for Ceres Global's breaches of contract;

c)  Judgment against Ceres Global for damages in amounts to be determined at trial for promissory estoppel and unjust enrichment for contributions outside the scope of the parties' contracts, including compensation for funds that Scoular has already invested plus the reasonable value of the expertise and effort Scoular contributed to the Northgate Project through its unique expertise;

d)  Judgment against Riverland for damages in amounts to be determined at trial for its interference with Scoular's contractual rights, including Scoular's attorney fees; and

e)  Such further relief as the Court may deem just and equitable.

DORSEY & WHITNEY LLP

Dated:  June 11, 2014

By  s/ Peter M. Lancaster
    Peter M. Lancaster (#0159840)
    lancaster.peter@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

***Attorneys for The Scoular Company***