# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| THE SCOULAR COMPANY, | Civil No.  14-1881 (JRT/HB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS** |
| CERES GLOBAL AG CORP., and RIVERLAND AG CORP., | |
| Defendants. | |

Peter M. Lancaster and Anne M. Trimberger, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN  55402, for plaintiff.

Lewis A. Remele, Jr. and Jeffrey R. Mulder, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN  55402, for defendants.

This case involves a contract dispute between a commodity logistics company, defendant Ceres Global Ag Corp. ("Ceres"), and an agricultural marketing company, plaintiff The Scoular Company ("Scoular").  Ceres is a Canadian company and Scoular is a Nebraska company with an office in Minnesota.  Ceres's subsidiary, Riverland Ag Corp. ("Riverland"), also a defendant in this case, is based in Minnesota and runs several grain elevators in the state.  Ceres approached Scoular about developing and running a grain elevator at Ceres's Northgate property in southwestern Canada.  Ceres and Riverland officials met Scoular officials in Minnesota at least three times and exchanged many phone calls that involved some officials based in Minnesota.  Most of the meetings occurred in Chicago, however, and the parties eventually signed several agreements,

including a non-binding Term Sheet.  The agreements set up Scoular to operate a grain elevator at Northgate, and did not call for any activity to take place in Minnesota.  The agreements were non-binding, however, and Ceres soon decided to take its grain operations at Northgate in-house.

Scoular brings this action against Ceres and Riverland for breaching its agreements with Scoular.  Ceres filed a motion to dismiss, arguing the Court lacks personal jurisdiction over Ceres or, in the alternative, that the case should be dismissed under the doctrine of *forum non conveniens*.  Because Scoular has demonstrated sufficient contact between Ceres and Minnesota, the Court will find that it has personal jurisdiction over Ceres.  In addition, the Court will conclude that the case should not be dismissed under the *forum non conveniens* doctrine.  The Court will deny Ceres's motion to dismiss.

## BACKGROUND

## I.      THE PARTIES AND THE NORTHGATE PROJECT

Scoular is an employee-owned Nebraska corporation with one of its offices located in Minneapolis, Minnesota.  (First Am. Compl. ("Compl.") ¶ 2, July 24, 2014, Docket No. 9.)  Scoular is an agricultural marketing company that manages commodity supply-chain risk for customers in the food, feed, and renewable fuel industries.  (*Id.*)  One aspect of its business, relevant to this case, is "planning, building, developing, and operating grain elevators and related rail transportation infrastructure."  (*Id.*)

Ceres is a publicly-traded Canadian company, based in Toronto. (*Id.* ¶ 3.) Ceres is an agriculture and commodity logistics holding company with two key areas of investment: (1) a "Grain Storage, Handling and Merchandising unit, anchored by its 100% ownership of [Riverland];" and (2) "its Commodity Logistics unit, containing its 25% interest in Stewart Southern Railway Inc. and its development of the Northgate, SK Commodity Logistics Hub ('Northgate Project')."  (Aff. of Michael Detlefsen in Supp. of Defs.' Mot. to Dismiss ("Detlefsen Aff.") ¶ 3, Aug. 7, 2014, Docket No. 14.) During the relevant period covered by the complaint in this case, Ceres employed only one or two people and therefore had no operational capabilities; the company was managed by Front Street Capital, an investment management firm.[1]  (Compl. ¶ 3.)

Riverland is a Delaware corporation, with an office in St. Louis Park, Minnesota. (*Id.* ¶ 4.)  Riverland is a wholly-owned subsidiary of Ceres, first acquired by the company in June 2010. (*Id.*)  The company "is a collection of grain storage and handling assets in Minnesota, New York, Wisconsin and Ontario." (Detlefsen Aff. ¶ 4.)

Ceres owns 1,300 acres of land at Northgate, Saskatchewan, along the United States-Canadian border, and ten adjoining acres of land across the border in North Dakota. (Compl. ¶¶ 12-13; Detlefsen Aff. ¶ 5.)  Ceres is developing the Northgate Project at its Northgate site. (Compl. ¶ 12.)  The Northgate Project is a "$90 million grain, oil and oilfield supplies transloading" and logistics hub, focused on increasing

---

[1] Scoular notes that Ceres's current Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") now reside in and work from Riverland's offices in Minnesota. (Decl. of Annie M. Trimberger in Supp. of Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Trimberger Decl."), Ex. 13 (Dep. of James T. Vanasek ("Vanasek Dep.")) at 29-33, Nov. 19, 2014, Docket No. 45.)

transportation of Canadian grain, oil, and other energy products into the United States. (Detlefsen Aff. ¶ 5; Compl. ¶¶ 12-14.)  The North Dakota land, and cross-border nature of the site, connects Canadian producers to the Burlington Northern Santa Fe ("BNSF") railroad in the United States and gives them unique access to United States customers. (Compl. ¶¶ 13-14.)

## II.    NEGOTIATIONS BETWEEN THE PARTIES

This case arises out of negotiations between the parties regarding the Northgate Project.  (*Id.* ¶ 1.)  In 2012, Ceres, through Riverland, approached Scoular about serving as the operator of its grain facility at the Northgate Project.  (*Id.* ¶¶ 10, 15.)  Scoular alleges that Ceres conceded neither it nor its subsidiary, Riverland, had the expertise needed to operate the high-volume grain facility it had planned for Northgate.  (*Id.* ¶ 15.) As a result, Ceres sought out Scoular to be the sole developer, operator, and owner of the grain facility at Northgate.  (*Id.* ¶¶ 16-19.)

The initial meeting between Ceres, Riverland, and Scoular occurred on June 26, 2012, in Minneapolis at Scoular's office.  (*Id.* ¶ 10.)  Two additional meetings took place in Minnesota, on August 28, 2012 and September 18, 2012.  (*Id.* ¶ 11.)  Former Ceres CEO Michael Detlefsen attended the initial meeting and the August 2012 meeting in Minnesota.  (Detlefsen Aff. ¶¶ 7-8.)  Another negotiating meeting took place in Kansas City, Missouri, near Scoular's Nebraska headquarters, on July 16, 2012.  (*Id.* ¶ 8.)  Most of the remaining meetings, in late 2012 and throughout 2013, took place in Chicago, Illinois.  (*Id.* ¶ 10.)  However, the parties held two additional meetings in Overland Park,

Kansas, and another in Toronto.  (*Id.* ¶ 11.)  According to Detlefsen, the Ceres Board of Directors initially involved Riverland because they wanted a joint-venture grain elevator run by both Riverland and Scoular.  (*Id.* ¶ 9.)  Once the Board scrapped that concept, Detlefsen claims Riverland was generally no longer involved in the negotiations.  (*Id.* ¶¶ 9-10.)  There were at least thirty phone calls between the parties during the negotiation period as well, some of which included Scoular corporate counsel Joan Maclin and Jann Eichlersmith, both of whom are based in Minnesota.  (*Id.* ¶ 12.)

As a result of these negotiations, the parties negotiated multiple agreements.  The parties signed a Mutual Confidentiality Agreement on June 20, 2012, governed by the laws of Saskatchewan Province.  (Trimberger Decl., Ex. 15 (Mutual Confidentiality Agreement) at 39-41.)  On November 15, 2012, the parties signed a Term Sheet.  (Compl. ¶ 20; Detlefsen Aff., Ex. A (Term Sheet-Project Corus) at 2-8.)  The Term Sheet, which is governed by the laws of Ontario Province, provides that Scoular and Ceres would establish a company to undertake development of Northgate and that Scoular would develop and manage a grain facility.  (Compl. ¶¶ 20-21.)  The Term Sheet was non-binding, save for its confidentiality and exclusivity provisions.  (*Id.* ¶ 23.)  The latter provision bars Ceres from entertaining proposals or entering into discussions with other parties other than Scoular with regard to the development of a grain facility at Northgate. (*Id.* ¶ 24.)  The Term Sheet contemplated activity at the Northgate site and not in Minnesota, although Ceres's February 5, 2013 press release announcing the initial agreement noted that Ceres's subsidiary, Riverland, which has significant operations in Minnesota, would be a "major customer of the grain facility."  (*Id.* ¶ 18.)  The parties

agreed to a short amendment to the Term Sheet on February 1, 2013.  (Detlefsen Aff., Ex. A (Term Sheet ADDENDUM-Project Corus) at 9-11.)  The parties also entered into a May 31, 2013 Cost-Sharing Agreement, which was likewise governed by the laws of Ontario.  (Compl. ¶ 34; Detlefsen Aff., Ex. B (Cost-Sharing Agreement) at 13-17.)  The Cost-Sharing Agreement provides Scoular with a right of first refusal related to any agreements covering grain facilities or grain-related activities at Northgate.  (Compl. ¶¶ 35-37; Detlefsen Aff., Ex. B at 13-14.)

## III.   PROCEDURAL HISTORY

After these agreements, Ceres later decided it would be better to bring the construction and operation of the Northgate elevator in-house.  (Detlefsen Aff. ¶ 14.) Detlefsen and another Ceres official, Tom Muir, traveled to Overland Park, Kansas on January 28, 2014 to inform Scoular that it would no longer be working with the company on Northgate.  (*Id.*)

Arguing that it had spent millions of dollars and hundreds of hours preparing to operate a grain facility at Northgate, only to have Ceres back out at the last minute, Scoular filed its first complaint on June 11, 2014 and filed this amended complaint on July 24, 2014 against Ceres and Riverland.  (Compl.)  Scoular alleges breach of the Term Sheet and Cost-Sharing Agreement by Ceres, along with interference with contract against Riverland.  (*Id.* ¶¶ 51-69.)  Scoular also claims promissory estoppel against Ceres and unjust enrichment against both defendants.  (*Id.* ¶¶ 70-86.)

As to personal jurisdiction, Scoular argues the Court has specific personal jurisdiction over Ceres. (*Id.* ¶ 7.) It argues the Court has specific **and general** personal jurisdiction over Riverland. (*Id.* ¶ 8.) Ceres filed a motion to dismiss on August 7, 2014, arguing that this Court lacks personal jurisdiction over Ceres and, in the alternative, that the doctrine of *forum non conveniens* requires dismissing this case. (Mot. to Dismiss, Aug. 7, 2014, Docket No. 11.)[2]

In advance of this hearing, Scoular sought jurisdiction-related discovery from Ceres. (Pl.'s Mot. for Leave to Conduct Jurisdictional Disc. & for a Continuance of Defs.' Mot. to Dismiss, Sept. 9, 2014, Docket No. 22.) The Magistrate Judge granted the motion, in part, allowing some discovery into material related to jurisdictional and *forum non conveniens* issues. (Order, Sept. 26, 2014, Docket No. 35.) Ceres has failed to provide some of the material Scoular seeks, claiming that Front Street Capital has the documents in question and will not release them. (Letter from Ceres Attorney Jeffrey R. Mulder to Magistrate Judge, Oct. 24, 2014, Docket No. 36.) An October 17, 2014 letter from a Front Street official, however, indicated otherwise. (Trimberger Decl., Ex. 19 (Letter from Front Street official Gary Selke to Ceres Chairman Doug Speers) at 54-55.) The Magistrate Judge responded by ordering the production of available documents and allowing Scoular to depose a representative of Ceres regarding discovery issues,

---

[2] The parties appear to agree that the Court has personal jurisdiction – both general and specific – over Riverland. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") at 8, August 7, 2014, Docket No. 13 ("This Court [l]acks [p]ersonal [j]urisdiction [o]ver **Ceres**." (emphasis added)); Reply Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Reply Mem.") at 8-11, Dec. 3, 2014, Docket No. 47; Scoular's Opp'n to Defs.' Mot. to Dismiss ("Scoular Opp'n") at 6-7, Nov. 19, 2014, Docket No. 44.)

especially in light of the discrepancy between Ceres's claims and Front Street's.  (Order, Oct. 28, 2014, Docket No. 38; *see also* Vanasek Dep.)  That deposition occurred on November 12, 2014.  (Vanasek Dep.)

## DISCUSSION

## I.   PERSONAL JURISDICTION

### A.    Standard

Rule 12(b)(2) of the Federal Rules of Civil Procedure provides that a party may move to dismiss claims for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  A plaintiff must allege sufficient facts in the complaint supporting a reasonable inference that the court can exercise personal jurisdiction over the defendant.  *Wells Dairy, Inc. v. Food Movers Int'l., Inc.*, 607 F.3d 515, 518 (8th Cir. 2010).  The plaintiff has the burden of proving facts to support personal jurisdiction once it has been challenged.  *Id.*  A plaintiff's prima facie showing of personal jurisdiction "must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto."  *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (internal quotation marks omitted).  The court resolves factual conflicts in the non-moving party's favor.  *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011).

"Because Minnesota's long-arm statute is 'coextensive with the limits of due process,' the only question is whether the exercise of personal jurisdiction comports with due process."  *CBS Interactive Inc. v. Nat'l. Football League Players Ass'n., Inc.*, 259

F.R.D. 398, 404 (D. Minn. 2009) (quoting *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus., Inc.*, 63 F.3d 694, 697 (8th Cir. 1995)).  Due process requires "minimum contacts" with the forum state.  *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996).  "The central question" in determining whether Ceres has sufficient minimum contacts with Minnesota "is whether [it] has purposefully availed itself of the privilege of conducting activities in the forum state and should, therefore, reasonably anticipate being haled into court there." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

> The Eighth Circuit has established
>
> a five-factor test . . . to determine the sufficiency of defendant's contacts . . . (1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties.

*Burlington Indus.*, 97 F.3d at 1102.  The first three factors are "of primary importance," and the Court may consider them together.  *Id.*; *Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996).

Personal jurisdiction can be either "specific or general." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 593 (8th Cir. 2011).  Specific jurisdiction "refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state." *Id.* (internal quotation marks omitted).  General jurisdiction "refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." *Id.*

(internal quotation marks omitted); *see also Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1121-22 (D. Minn. 1996) ("A defendant is subject to general jurisdiction in the forum state if it conducts business in a continuous and systematic manner such that it becomes subject to the jurisdiction of the forum for any purpose, including those unrelated to the defendant's contacts with the forum.  For specific jurisdiction over a defendant with minimum contacts with the forum, the due process clause requires that the case 'arise out of or be related to' those contacts."), *aff'd sub nom. Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305 (8th Cir. 1997). Here, Scoular only alleges specific jurisdiction over Ceres.  (Compl. ¶ 6.)

### B.     First Three Personal Jurisdiction Factors

Focusing on the first three factors of the Eighth Circuit's personal jurisdiction test, Ceres argues that Scoular has failed to demonstrate sufficient contacts between Ceres and Minnesota, or that Ceres purposely availed itself of the privilege of conducting business in Minnesota.  Ceres cites *Digi-Tel Holdings, Inc.*, in which the Eighth Circuit affirmed the dismissal of a complaint for lack of personal jurisdiction. 89 F.3d at 523-25.  The case involved a Minnesota plaintiff, suing as a third-party beneficiary to enforce a contract between another Minnesota corporation and a Singaporean corporation for 240,000 cell phones. *Id.* at 520-21.

The Eighth Circuit concluded no personal jurisdiction existed over the Singaporean corporation, even where (1) there were "numerous letters and faxes and . . . several telephone calls to Minnesota" by the defendant; (2) there was a choice-of-law

provision in the contract that favored Minnesota; (3) sample cellular phones (the subject of the contract) were shipped to Minnesota; (4) the foreign defendant's parent company applied for a Minnesota copyright; (5) the foreign defendant's parent company attended a meeting in Minnesota with the plaintiff; and (6) the foreign defendant's parent company made a settlement offer to the plaintiff at the Minnesota meeting. *Id.* at 523-25. The court reasoned that all seven of the face-to-face meetings regarding the contract had occurred in Singapore and that no part of the contract was to be performed in Minnesota. *Id.* at 525. In other words, "the negotiations, meetings, production, and delivery were all centered in Singapore." *Id.* "The contacts with Minnesota appear at best as inconsequential rather than substantial . . . ." *Id.*

At first glance, this case may appear to present a weaker case for jurisdiction than *Digi-Tel*. In *Digi-Tel*, one party was based in Minnesota – whereas both parties in this case are headquartered elsewhere, products were repeatedly shipped to the state, and a substantive meeting occurred in the state. *Id.* at 523-25. But this case also involves a significant number of contacts with the state, such as the thirty-plus phone calls that involved Scoular employees residing in Minnesota. (Detlefsen Aff. ¶ 12.) Moreover, a closer examination shows that Scoular's arguments for jurisdiction are **actually stronger** than those in *Digi-Tel*. Here, unlike in *Digi-Tel*, in-person meetings **about the contract at issue** in the underlying action occurred in Minnesota. (Compl. ¶¶ 10-11.) Indeed, Ceres's former CEO acknowledges that he attended two such meetings at Scoular's Minneapolis office. (Detlefsen Aff. ¶¶ 7-8.)

More importantly, despite Ceres's protestations to the contrary, Scoular has sufficiently demonstrated that the contract at issue, and the Northgate Project in general, envision operating in Minnesota and taking advantage of the markets that exist in the state.  As Ceres's former CEO admits, the initial solicitation envisioned a joint-effort by Scoular to run a grain elevator at Northgate with Riverland, a corporation with a large physical Minnesota presence.  (Detlefsen Aff. ¶ 9.)  But to the extent Ceres argues that, as negotiations continued, Riverland backed away and the connection between Scoular – and the Northgate Project generally – and Minnesota evaporated, the record shows the opposite.  Indeed, in an internal slide explaining why Ceres would no longer use Scoular at Northgate, Ceres explicitly stated that Riverland was now able "to fill space in the Minneapolis and Duluth delivery markets."  (Trimberger Decl., Ex. 8 (Ceres Northgate Slides) at 9.)  Minutes from Board meetings and other record documents affirm that Ceres sought out Scoular to increase its access to northern United States markets, including Minnesota, and that connecting Northgate to Riverland and Minnesota was a general focus of the entire Northgate Project.[3]  (Trimberger Decl., Ex. 12 (Minutes of Ceres Board Meeting) at 21; *see also id.*, Ex. 9 (Riverland Ag Corp. Bank Presentation) at 12-13.)

---

[3] Indeed, Ceres's attempt to dismiss the relevance of Riverland is belied by two facts.  First, Riverland was in the initial meetings with Scoular, in the hopes that Riverland would jointly run a Northgate grain elevator with Scoular.  Second, now that the negotiations between Scoular and Ceres have collapsed, Riverland will ultimately play the role first envisioned by Ceres for Scoular.  Riverland may not have been intimately involved in the later stages of the negotiations between Ceres and Scoular, but the record does not support Ceres's attempt to characterize it as irrelevant.

In other words, Scoular has shown that the contract at issue – and the grain elevator project that contract involves – have from the early solicitation of Scoular to present, envisioned taking advantage of business opportunities in Minnesota.  *See Burger King Corp.*, 471 U.S. at 473 ("[W]e have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." (internal quotation marks omitted)); *Viracon, Inc. v. J&L Curtain Wall LLC*, 929 F. Supp. 2d 878, 884 (D. Minn. 2013) ("Minnesota courts have recognized that the crucial factor in determining whether the defendant availed itself of jurisdiction is the nonresident defendant's effort to initiate or induce the transaction." (internal quotation marks omitted)).

Regardless of how one characterizes the **quantity** of contacts in this case, the **quality** of those contacts – substantive meetings and business solicitation that envisions operating in and taking advantage of the state – and the contacts' connection to the contract and project that underlie the cause of action, are enough to give the Court specific personal jurisdiction over Ceres.  *Burlington Indus.*, 97 F.3d at 1102.  Indeed, the three substantive Minnesota meetings related to the contract at issue; the phone calls involving Minnesota residents discussing the contract; and Ceres's solicitation of Scoular in Minnesota and desire to avail itself of business opportunities in the state, are enough to distinguish this case from *Digi-Tel* and give Ceres "fair warning of being sued in Minnesota."  *Cambria Co., LLC v. Pental Granite & Marble, Inc.*, No. 12-228, 2013 WL 1249216, at *6 (D. Minn. Mar. 27, 2013).

This case is closer to *Aero Systems Engineering, Inc. v. Opron, Inc.*, 21 F. Supp. 2d 990, 993 (D. Minn. 1998), than *Digi-Tel*. *Aero* involved a contract dispute between a Minnesota corporation, headquartered in St. Paul and specializing in consulting services in connection with the construction of test facilities for jet engines, and a Canadian corporation, a heavy industrial construction company. *Aero Sys. Eng'g, Inc.*, 21 F. Supp. 2d at 994. The two companies reached an agreement, following extensive negotiations, to construct a Rolls-Royce jet engine testing facility in Quebec Province, with Opron as the general contractor and Aero as a subcontractor. *Id.* at 994. A dispute between the two companies eventually developed and Aero sued Opron as a result. *Id.*

The two cases are somewhat different. Aero was a company incorporated in Minnesota, where Scoular is not. *Id.* at 994. Moreover, the contractual arrangement was ultimately signed in Minnesota. *Id.* at 997. The majority of the labor called for under the agreement was performed in Minnesota, with Canadian representatives of Opron flying to Minnesota repeatedly to monitor Aero's efforts. *Id.*

Still, there are significant similarities between the two cases. First, negotiations took place in Minnesota in *Aero*, just as initial substantive solicitation meetings took place in Minnesota in this case. *Id.* There were also significant other contacts: in this case, thirty phone calls involving Minnesota residents; in *Aero*, hundreds of letters and faxes were sent from Opron to Aero in St. Paul. *Id.* This case may not have involved direct work in Minnesota – the contract between Scoular and Ceres envisioned Scoular building and operating a grain elevator in Canada, but it also imagined the contract – and

Northgate Project generally – taking advantage of the nearby Minnesota markets. Moreover, differences between the cases make Scoular's arguments stronger than in *Aero*. In *Aero*, the defendant had no Minnesota subsidiary with Minnesota facilities. *Id.* at 994. Moreover, three of four rounds of negotiations took place in Canada – whereas three substantive meetings took place in Minnesota in this case. *Id.*

In sum, Scoular has shown that, like in *Aero*, and unlike in *Digi-Tel*, there are sufficient contacts, of a significant enough quality and tied closely enough to the cause of action in this case, to show that the Court has personal jurisdiction over Ceres. Ceres purposely availed itself of the opportunity to solicit Scoular in Minnesota, and take advantage of economic opportunity in the state, and it had fair warning that it might be subject to the state's courts.[4] *Cambria Co., LLC*, 2013 WL 1249216, at *6.

---

[4] Ceres also focuses on the fact that in many of the cases Scoular cites, the plaintiff asserting jurisdiction is a Minnesota corporation. But the Supreme Court has indicated that ties between the **plaintiff** and the forum state are not the focus of the personal jurisdiction analysis. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984) ("[W]e have not to date required a plaintiff to have 'minimum contacts' with the forum State before permitting that State to assert personal jurisdiction over a nonresident defendant. On the contrary, we have upheld the assertion of jurisdiction where such contacts were entirely lacking."); *Servewell Plumbing, LLC v. Fed. Ins. Co.*, 439 F.3d 786, 789-90 (8th Cir. 2006) (rejecting a jurisdictional argument that relied in part on the plaintiff's lack of ties to the forum state as "wholly without merit," and noting that the focus under personal jurisdiction doctrine "is on the relationship among the defendant, the forum, and the litigation" (internal quotation marks omitted)). Neither company in this case is incorporated in Minnesota, but that fact is not dispositive. Both companies have a strong presence in Minnesota, and Ceres's behavior and contacts with the state are enough to justify this Court's exercise of jurisdiction.

As for the remaining two Eighth Circuit personal jurisdiction factors, Scoular concedes that it does not benefit from the factor that discusses the state's interest in providing a forum state for its residents. *Burlington Indus.*, 97 F.3d at 1102. But, given that Scoular has a presence in Minnesota, as does Ceres, and that Scoular's case against Riverland will continue regardless, it is certainly more convenient for the parties to litigate the case in this district. *Id.* As a result, the remaining personal jurisdiction factors also support the Court's conclusion that it has personal jurisdiction over Ceres.

## II.    *FORUM NON CONVENIENS*

Ceres also asks the court to dismiss this case under the doctrine of *forum non conveniens*. That doctrine "allows a court to decline to exercise jurisdiction and dismiss a case where that case would more appropriately be brought in a foreign jurisdiction." *K-V Pharm. Co.*, 648 F.3d at 597. The doctrine requires an alternative forum to be available and is applied only in "exceptional circumstances." *Id.* at 597 (internal quotation marks omitted). The plaintiff's choice of forum "should rarely be disturbed." *Id.* at 598 (internal quotation marks omitted). Whether to dismiss based on the *forum non conveniens* doctrine depends largely on an analysis of private- and public-interest factors set forth by the Supreme Court ("*Gulf Oil Corp.* factors"):

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained . . . .

> Factors of public interest also have [a] place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* at 597 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 508-09 (1947)).

The parties do not dispute that an adequate alternative forum exists (e.g., Ontario Province, Canada). *See, e.g.*, *Aero Sys. Eng'g, Inc.*, 21 F. Supp. 2d at 999-1000 (concluding that the "Canadian judicial system provides an available and adequate alternative forum for this litigation"). Ceres does contend, however, that Scoular's choice of forum is not entitled to deference because Scoular is not incorporated in Minnesota. This argument again focuses too sharply on Scoular's state of incorporation, and gives its choice too little deference. *See, e.g.*, *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc) ("It is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district. Rather, the court must consider a plaintiff's likely motivations in light of all the relevant indications.").

Even if Ceres is correct, however, that Scoular's choice should be afforded less deference than it would deserve if it were a Minnesota corporation, the Court nevertheless concludes that Scoular is entitled to **some** deference and that, in any event, Ceres has failed to demonstrate the "exceptional circumstance" required to justify dismissal under the doctrine of *forum non conveniens*. *K-V Pharm. Co.*, 648 F.3d at 597. As to the private-interest factors, Ceres has not shown that Ontario would be significantly more convenient. Some of the initial meetings at issue in this case took place in Minnesota, both companies have a presence in Minnesota, and the state is geographically close to the disputed project area. While there will be some travel involved with litigation in Minnesota, it is not clear that any one other location would be any more

convenient, or equally convenient.  Indeed, litigation in Ontario would be significantly less convenient for Scoular.  Moreover, Scoular makes the strong argument that Canadian procedural rules would make it more difficult to access Canadian witnesses.

Finally, as to the public factors, no forum stands out as particularly compelling under that analysis.  No jurisdiction or group of citizens has any particular interest in, or need to be close to, this litigation.  The burden of showing the need for dismissal under *forum non conveniens*, however, falls on Ceres.  *Aero Sys. Eng'g, Inc.*, 21 F. Supp. 2d at 999.  Even if this forum is not the unequivocal victor under each factor of the *Gulf Oil Corp.* factors, it is still the best option among various jurisdictions that all have some weight under *Gulf Oil Corp.*  At a minimum, Ceres has not met its burden of showing that "exceptional circumstances" exist that show Ontario to be the best forum and to justify dismissal.  *K-V Pharm. Co.*, 648 F.3d at 597.  As a result, the Court will decline to dismiss the case under the *forum non conveniens* doctrine.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion to Dismiss for Lack of Jurisdiction [Docket No. 11] is **DENIED**.

DATED:  March 19, 2015
at Minneapolis, Minnesota.

_s/ John R. Tunheim_
JOHN R. TUNHEIM
United States District Judge