# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

THE SCOULAR COMPANY,                              Civil No. 14-1881 (JRT/HB)

             Plaintiff,

v.                                                              **MEMORANDUM OPINION**
                                                                **AND ORDER**

CERES GLOBAL AG CORP. and
RIVERLAND AG CORP.,

             Defendants.

> Peter M. Lancaster, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for plaintiff.
>
> Jeffrey R. Mulder and Daniel R. Olson, **BASSFORD REMELE**, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, for defendants.

Plaintiff The Scoular Company ("Scoular") brings this action against Defendants Ceres Global Ag Corp. ("Ceres") and Riverland Ag Corp. ("Riverland") (collectively "Defendants"). Scoular's claims stem from a planned deal under which it would partially own and operate a grain storage and transit point on the North Dakota-Canada border. Following more than a year of negotiations and several tentative agreements, Ceres changed course and decided to complete the project with its subsidiary Riverland instead. Scoular alleges claims of breach of contract, tortious interference with contract, promissory estoppel, and unjust enrichment based on Defendants' handling of the project.

Defendants now move for summary judgment and to exclude the opinions of Scoular's damages expert. Because the Court rejects Defendants' interpretations of the

contracts at issue and because the Court finds no absolute parent-subsidiary privilege implicated by Scoular's tortious interference with contract claim, the Court will deny Defendants' motion for summary judgment. Also, the Court will deny Defendants' motion to exclude, finding the opinions of Scoular's damages expert are not irrelevant, unreliable, or so factually unsupported as to warrant exclusion.

## BACKGROUND

Scoular is an "agricultural marketing company" that "manag[es] commodity supply-chain risk for customers in food, feed, and renewable fuel markets." (Am. Compl. ¶ 2, July 24, 2014, Docket No. 9.) Ceres is a "financial assets management firm with focus on grain storage and handling and commodity logistics." (*Id.* ¶ 3.) Riverland is Ceres's wholly owned subsidiary, and "[a]mong other activities, [it] has owned and operated ten or more grain elevators." (*Id.* ¶ 4.)

Ceres owns a piece of land in Northgate, Saskatchewan, and adjacent land in North Dakota. (*Id.* ¶ 13.) Ceres sought to develop the site for "increased north-to-south flow of Canadian grain, railway facilities for transport of crude oil production, and transfer facilities for such related products as frac sand, pipe, and aggregates." (*Id.* ¶¶ 14.) "The border crossing site is unique for its proximity to Canadian oil and grain production." (*Id.* ¶ 13.)

In summer 2012, Ceres and Scoular began negotiations regarding a plan to develop the site, referred to generally as "Northgate." (*See* Decl. of Jeffrey R. Mulder ("Mulder Decl."), Exs. 1, 2, Sept. 30, 2016, Docket No. 128.) In August 2012, Ceres

proposed forming jointly-owned companies to construct and operate the site. (*See id.*, Ex. 3.) Scoular responded with support for a joint company, but requested to be the exclusive operator at the site. (*Id.*, Ex. 4; *see also* Decl. of Peter M. Lancaster ("Lancaster Decl."), Ex. C at 30:8-12, Oct. 21, 2016, Docket No. 135 (stating that Scoular consistently communicated it wanted to be the sole operator of the site).) The parties exchanged draft memoranda of understanding in fall 2012. (Mulder Decl., Exs. 5, 6.)

## I.    THE TERM SHEET

On November 15, 2012, the parties executed a document titled Term Sheet – Project Corus (the "Term Sheet"). (Aff. of Michael Detlefsen ("Detlefsen Aff."), Ex. A ("Term Sheet"), Aug. 7, 2014, Docket No. 14.) The Term Sheet provides some of the terms of the parties' understanding, but it contemplates the execution of a more detailed agreement at a later date. (*See, e.g., id.* at 2 ("The respective rights and duties of Scoular and Port[C]o[1] . . . will be incorporated into the Unanimous Shareholders Agreement . . . or set forth in a Management and Development Agreement . . . ."); *id.* at 4 (stating that "[t]he Parties will negotiate in good faith a Unanimous Shareholder's Agreement . . . relating to PortCo containing provision that are normal and customary" regarding several issues).) The Term Sheet states that "[e]stablishment and funding of PortCo and the

---

[1] PortCo refers to the entity Ceres and Scoular would create together to develop the site. (Term Sheet at 2.)

Grain Facility [would] be conditional on," among other things, "[n]egotiation and execution of definitive agreements" between the parties. (*Id.* at 5.)

In a section titled "**Non-Binding**," the Term Sheet states:

> The Parties agree that this term sheet reflects the serious intention of the Parties to take the steps needed in order to enter into the Definitive Agreements. Notwithstanding, except for the "Confidentiality" and "Exclusivity" provisions contained herein, which shall be binding on the Parties, this term sheet shall not constitute any binding agreement of the Parties, does not constitute a partnership, joint venture, co-marketing or principle-agent agreement or other binding obligation between the Parties, and shall not obligate any of the Parties to enter into any transaction in connection with the Project or any of the documents contemplated herein.

> If for any reason whatsoever the Parties fail to execute the Definitive Agreements, no Party will be entitled to make any claim to the others as a consequence of the failure by the Parties to reach an agreement.

(*Id.* at 6.) The exclusivity section states:

> Ceres agrees that it will not entertain proposals or enter into discussions with parties other than Scoular pertaining to the development of a grain facility on the Northgate Land for a period coterminous with the Term of this term sheet.

(*Id.*) Following further negotiations, the parties executed a Term Sheet Addendum on February 1, 2013. (*Id.* at 9-11.) The Addendum altered some details of the Term Sheet, but did not alter the binding and non-binding aspects of the Term Sheet. (*See id.*)

Contemporaneous records suggest Scoular recognized the generally nonbinding nature of the Term Sheet. Soon after the Addendum was executed, Ceres issued a press release discussing the deal. (Mulder Decl., Ex. 7 at Scoular012789-91.) Scoular's Chief Operating Officer, Robert Ludington, forwarded the press release to Scoular's board of directors stating that he "want[ed] to assure the Board the management team ha[d] not

committed to anything," that they "ha[d] a signed term sheet and [were] working towards definitive documents but ha[d] made no financial commitments and Ceres [was] perfectly aware that Scoular's Board of Directors must give it's [sic] approval before any commitment is made."  (*Id.* at Scoular012788.)

## II.    THE SIDE LETTER

In May 2013, while continuing to negotiate on final agreements, the parties entered into a side agreement, referred to as the "Side Letter," in order to fund and begin mass grading at Northgate.  (*See* Mulder Decl., Exs. 17-19.)  The parties executed the Side Letter on May 31, 2013.  (*See* Detlefsen Aff., Ex. B ("Side Letter").)  Under the Side Letter, Ceres and Scoular would share the costs of the mass grading project.  (*Id.* at 13.)

According to Scoular, its injection of cash at this time was crucial because Ceres lacked funds.  (*See* Lancaster Decl., Ex. E at 79:17-80:7 (Ludington noting that he became "aware that Ceres wasn't able to fund [the] prework").)  It appears that Ceres did not secure a line of credit until December 2013 at the earliest, and possibly as late as June 2014.  (*See id.*, Ex. D at 29:11-24, 37:10-23; *id.* Ex. H at 281.)

In order to "secure" Scoular's investment in the project, the Side Letter gave Scoular a right of first refusal.  (*See* Mulder Decl., Ex. 18 at SCOULAR028124; Side Letter at 13-14.)  The right of first refusal required Ceres to notify Scoular "if Ceres or an affiliate thereof . . . proposes to enter into any binding commitment with any party other than Scoular . . . , without Scoular's prior consent, to design, build and/or operate any

grain facility or other facility" at Northgate for three years from the date of the Side Letter. (Side Letter at 13.) Scoular then could choose to enter into the same commitment with Ceres within thirty days of the notice – at a reduced price to Scoular due to its existing investment in grading costs. (*Id.* at 14.) If Scoular declined, Ceres could enter into the commitment with the third party within ninety days after the expiration of Scoular's thirty-day option period. (*Id.*)

The Side Letter also contains a provision entitled "Reimbursement," which states that

> [within the three-year period,] if Ceres constructs or causes to be constructed . . . any improvement that is substantially inconsistent with the Green Design and/or the Term Sheet, then Scoular is entitled, by delivering notice thereof to Ceres (the "**Reimbursement Notice**"), to be reimbursed the Shared Costs paid by Scoular from the Effective Date until the date of the Reimbursement Notice (excluding amounts paid as a result of the negligent act or omission or willful misconduct of Scoular, or a breach of this Agreement by Scoular), and thereafter Scoular shall be relieved of any responsibility for all Shared Costs.

(*Id.* at 14.)

Finally, the Side Letter includes the following provision regarding liability:

> **No Liability for Other's Negligence**. Notwithstanding anything contained herein to the contrary, no Party shall be liable to the other Party for any and all costs, expenses, liabilities and damages arising out of the negligent act or omission or willful misconduct of such other Party; nor shall either Party be liable to the other for costs, expenses, liabilities or damages arising out of a breach of the [mass grading contract] (unless such breach results from an act or omission caused or agreed to by Scoular) or of this Agreement by such Party.

(*Id.* at 15.) Pursuant to the Side Letter, Scoular contributed 3,899,146 Canadian dollars to grading costs for Northgate. (Mulder Decl., Ex. 10 at 177:25-181:5.)

## III.    CHANGES TO THE NORTHGATE DEAL

In July 2013, Ceres's board voted for a change in management.  (*See id.*, Ex. 22.)
Scoular describes this change in management as a takeover by James Vanasek, and
Scoular contends that Vanasek persuaded the new Ceres board to replace Scoular with
Riverland.  (*See* Lancaster Decl., Ex. A at 69:5-72:24; *id.*, Ex. H at 232 (Vanasek in a
December 2013 email, stating, "I ask again, so why would we want to give this up to
Scoular?????").)  On the other hand, Ceres contends that Scoular attempted to negotiate a
better deal after the management changes, in September and October 2013.  (*See, e.g.*,
Mulder Decl., Ex. 23 (September 2013 letter in which Scoular proposes "a different
approach" to the Northgate deal); *id.*, Ex. 24 (October 2013 correspondence discussing
changes in circumstances and Scoular's wish for additional ownership); *see also id.*,
Exs. 25, 26.)  On December 2, 2013, Scoular sent a signed second addendum to the term
sheet dated November 21, 2013 (the "November 2013 Addendum").  (*See* Mulder Decl.,
Ex. 27.)

Scoular contends that it had no reason to suspect that Ceres would consider
completing Northgate with Riverland.  During initial negotiations, Ceres understood
Scoular wanted to be the sole operator of the facility and that Riverland would not be
involved.  (*See* Lancaster Decl., Ex. C at 38:9-40:6.)  Riverland was having financial
trouble at the time, and eventually Ceres liquidated Riverland's assets.  (*Id.* at 43:7-45:2.)
Ceres C.E.O. Michael Detlefsen testified that "Riverland was not able to fill" the
necessary role at Northgate, and he shared this view with Scoular.  (*Id.* at 190:3-12.)

Thus, Scoular contends that it reasonably concluded that it would not face competition from Riverland. (*See* Lancaster Decl., Ex. E at 40:16-41:20 (stating that Riverland was "out of any picture at all of being a part of the grain facility except being a customer" and noting that Riverland was put up for sale during negotiations); *id.* at 71:2-72:20 (Ludington stating that Ceres made clear Riverland would not be involved in Northgate prior to the execution of the Term Sheet Addendum in February 2013).) Ludington also testified that in Scoular's industry, it was normal to rely on oral assurances. (*Id.* at 101:18-25 ("The business that Scoular is in, we do $6 billion of sales all over the phone followed up by contracts and things.").)[2]

An email from November 22, 2013, shows Ceres's concern over declining to deal with Scoular prior to determining the viability of a plan with Riverland. (*Id.*, Ex. H at 60.) At a meeting on November 27, 2013, Ceres's board discussed the possibility of Riverland taking over as operator of Northgate, and the meeting minutes note that Riverland and Detlefsen planned to "prepare an in-depth analysis of [Riverland] building and operating the grain facility at Northgate." (*Id.* at 455-56.) Then, in early December 2013, Ceres's new board declined to adopt the November 2013 Addendum and expressed that they would study whether to enter a deal with Scoular or not; in response, Scoular

---

[2] Scoular devotes space in its brief to argue that since it filed this action Ceres has attempted obscure the facts regarding Riverland's involvement with Northgate and the opportunities Ceres provided Scoular during the relevant time period. (*See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 16-19, Oct. 21, 2016, Docket No. 134.) However, Ceres does not rely on those actions or that argument in this summary judgment motion, and therefore, the Court need not consider Scoular's allegations at this time.

rescinded its execution of the document. (Mulder Decl., Ex. 10 at 127:5-129:18; *id.*, Ex. 28.)

During the next few months, discussions continued within Ceres and Riverland regarding replacing Scoular with Riverland. (*See* Lancaster Decl., Ex. H at 136 (internal Ceres email from December 12, 2013, considering Riverland and stating "the replacement margins look pretty compelling); *id.*, Ex. C at 90:20-91:5 (discussing "a process with the Riverland team to put together an alternative plan in preparation for [the] January [2014 board] meeting").) On January 6, 2014, Riverland held an internal "[g]roup discussion to define the pros and cons of Riverland operating Northgate versus Scoular." (*Id.*, Ex. H at 65.)

On January 22, 2014, Ceres's board heard from both Ceres and Riverland officials about their options for Northgate. (*See id.* at 314-16; *id.*, Ex. C at 99:18-100:11.) The Ceres board decided to complete the Northgate project internally through Riverland and directed Detlefsen to notify Scoular. (*Id.*, Ex. H at 315-16.) Detlefsen met with Scoular on January 28, 2014, "and delivered the message that the Ceres Board ha[d] decided to proceed with Riverland building and operating Northgate . . . instead of Scoular," after which "Scoular was a bit shocked." (*Id.* at 73.) According to Ludington, Detlefsen represented at the meeting that "in [Ceres's] opinion [Ceres was] not obligated under the mass grading contract to pay [Scoular] back"; Ludington then "questioned [Ceres's] integrity to even suggest that [Ceres] not pay [Scoular] back" and also "[q]uestioned their integrity in changing the deal." (*Id.* at 201.) On January 31, 2014, Detlefsen sent Ludington a draft termination and settlement agreement. (Mulder Decl., Ex. 29.)

On February 12, 2014, Ceres issued a press release stating that it "terminated its arrangements and ongoing discussions with [Scoular] with respect to" Northgate, and that it "plan[ned] to use its 100% owned subsidiary, [Riverland], to bring in-house the design and development of the proposed Northgate grain elevator." (Lancaster Decl., Ex. H at 255.) The next day, Ceres sent Scoular an email that terminated prior agreements between the parties, provided its view that completing the project internally did not implicate Scoular's right of first refusal, and gave Scoular two options: receive reimbursement in exchange for termination of the Side Letter (and the right of first refusal) or receive nothing. (Mulder Decl., Ex. 30.)[3] Scoular responded by filing this action on June 11, 2014.

Scoular brings the following claims: breach of the Term Sheet against Ceres, breach of the Side Letter against Ceres, tortious interference with contract against Riverland, promissory estoppel against Ceres, and unjust enrichment against both Ceres and Riverland. (Am. Compl. ¶¶ 51-86.) Defendants move for summary judgment on all of Scoular's claims and to exclude the opinions of Scoular's damages expert, Dr. Timothy Nantell.

---

[3] Vanasek stated in a late February 2014 email to a Ceres board member: "Anything besides telling [Scoular] to drop dead, sign the release and we will give you your $4 million back is a complete nonstarter for me." (Lancaster Decl., Ex. H at 238.)

## ANALYSIS

## I. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Breach of the Term Sheet

Ceres argues that Scoular's breach of contract claim based on the Term Sheet fails because the Term Sheet is unenforceable. Both parties agree that Ontario law applies to this claim. (*See* Term Sheet at 6.)

Ceres contends that the Term Sheet is unenforceable because it is merely an agreement to agree. *See Bawitko Invs. Ltd. v. Kernels Popcorn Ltd.*, 1991 CanLII 2734 at

13 (Can. Ont. C.A.). Both parties recognize that the Term Sheet's description of the Northgate project is not final. The Term Sheet contemplates future definitive agreements, and thus, it is not a binding contract with regard to the deal as a whole. Scoular's breach of contract claim, however, is based on the portions of the Term Sheet that are explicitly binding – the exclusivity and confidentiality provisions. As discussed above, the portion of the Term Sheet titled "Non-Binding" states that the Term Sheet does not create an obligation between the parties, "except for the 'Confidentiality' and 'Exclusivity' provisions contained herein, which shall be binding on the Parties." (Term Sheet at 6.)

Ceres argues that to be binding a contract must disclose all essential terms – implying that the Term Sheet could not be binding in any respect unless it set out all details of the relationship between the parties. The cases Ceres cites involve contemplated agreements, in which the parties agreed on some terms, but the deal never came to pass; none of them involve a signed agreement stating therein that some of the terms are to be binding as of the date of execution. *See Enticor Props. Inc. v. Quik-Run Courier Ltd.*, [2005] O.J. No. 530, paras. 4-5 (Can. Ont. C.A.) (QL) (finding a lease offer was not an enforceable contract where it stated that it would be void if no formal lease was executed within a certain amount of time); *Bawitko Invs. Ltd.*, 1991 CanLII 2734 at 13-14 (finding no enforceable contract where parties had orally agreed to some terms, but never reached a full agreement or executed a written contract); *Exch. Corp. Can. v. Swytch Delivery Sols. Inc.*, [2007] O.J. No. 3008, paras. 8-9 (Can. Ont. Sup. Ct. J.) (QL) (finding no enforceable contract where a party had only "discussed many times *[its]*

*intention* to use [the other party] as its exclusive supplier" once another contract expired, but had never entered into any written contract or agreement providing as much). This is not a case where the parties only agreed on several terms that they contemplated would form part of a future agreement. The Term Sheet sets out the parties' intentions for a future agreement, but it distinguishes those future terms from the exclusivity and confidentiality provisions, which the Term Sheet states were binding on the parties upon execution of the Term Sheet.

Thus, the Court will deny Ceres's motion with regard to this claim because the Term Sheet specifies that several of its provisions are binding, and Ceres makes no alternative arguments.

### C.     Breach of the Side Letter

Ceres argues that Scoular's breach of contract claim based on the Side Letter fails for two independent reasons: (1) an agreement between Ceres and Riverland would not trigger Scoular's right of first refusal under the Side Letter, and (2) Scoular waived its right to recover damages under the Side Letter.[4] The parties agree that Ontario law applies to this claim. (*See* Side Letter at 15.)

---

[4] Ceres also notes that it disputes that Ceres and Riverland ever entered into a contract, but, acknowledging that factual issues remain on that issue, Ceres assumes that there was a contract for the purposes of the present motion. (*See* Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 16, Sept. 30, 2016, Docket No. 127.)

### 1.    Right of First Refusal

The parties disagree on the scope of Scoular's right of first refusal and whether or not the agreement between Ceres and its subsidiary, Riverland, implicates that right.  As discussed above, Ceres's duty to notify Scoular arises "if Ceres or an affiliate thereof . . . proposes to enter into any binding commitment with any party other than Scoular . . . , without Scoular's prior consent, to design, build and/or operate any grain facility or other facility for the conduct of Grain Activities on the Project Lands."  (Side Letter at 13.)  Both parties argue that this plain language supports their interpretation of the contract.

Ceres argues that the mention of "Ceres or an affiliate thereof" means that the right of first refusal only applies to agreements between Ceres and non-affiliated third parties.  But the "or an affiliate thereof" language expands the first part of the sentence, which describes whose conduct could implicate the provision; thus, under a plain reading of the provision, the addition of "or affiliates" expands the scope of that clause rather than limiting it – both Ceres and Riverland (as Ceres's "affiliate") are barred from entering into a binding agreement "with any party other than Scoular" to construct or operate Northgate without notifying Scoular.

Ceres suggests that a right of first refusal always excludes internal or non-arm's length transactions.  For support, Ceres cites the generic definition of "right of first refusal."  *Right of First Refusal*, Black's Law Dictionary (10th ed. 2014) ("A potential buyer's contractual right to meet the terms of a third party's higher offer.").  But here, the contract defines the right of first refusal at issue, and thus, the terms of the contract govern. *See Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53, para. 57 (Can.)

("The interpretation of a written contractual provision must always be grounded in the text and read in light of the entire contract."); *Gross Realty Grp. v. Shoppers Realty Inc.*, 2014 ONSC 6855, para. 31 (Can.) ("The clause makes sense in its words and in the contemporaneous circumstances. There is no need to go further."); *cf. Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.3d 221, 226 (5th Cir. 2010) (looking to dictionary definitions to determine the plain meaning of terms only "[b]ecause the terms [were] not defined in the contract").

The Canadian cases the parties cite involving rights of first refusal do not suggest otherwise. Both parties discuss *GATX Corp. v. Hawker Siddeley Can. Inc.*, 1996 CanLII 8286 (Can. Ont. Gen. Div.).[5] The court in *GATX* dealt with an internal transfer of shares that would enable a takeover of those shares by a third party, which if done directly would have implicated the right of first refusal. *Id.* para. 45. As Ceres notes, the *GATX* court found that the internal transfer would have been proper under the agreement, if not for the agreement to then sell to a third party. *Id.* paras. 66-67. However, the contract language at issue in *GATX* explicitly excepted internal transfers from the right of first refusal, and thus, *GATX* does not stand for the proposition that all rights of first refusal only apply to deals with non-affiliates. *See id.* paras. 14-16 (quoting contract language stating that "[t]he transfer of common shares by either party to another corporation which is affiliated with . . . either of the parties" did not implicate the right of first refusal and

---

[5] *See also Transamerica Life Can. Inc. v. ING Can. Inc.* (2003), 68 O.R. 3d 457, para. 53 (Can. Ont. C.A.) (citing *GATX*, 1996 CanLII 8286).

describing record evidence of one party requesting this exception). Moreover, the *GATX* court looked beyond that initial transfer, to the function of the entire agreement, and stated that "the grantor of a right of first refusal must act reasonably and in good faith in relation to that right, and must not act in a fashion designed to eviscerate the very right which has been given." *Id.* paras. 69, 71.

Additionally, Scoular cites one Ontario case in which the court found a non-arm's length entity was a "third party" under the applicable right of first refusal. In *Apex Corp. v. Ceco Developments, Ltd.*, the court found that a corporation (Apex One) that reorganized and transferred its assets to a different corporation (Apex Two) violated a right of first refusal, even though everything remained the same in the corporation and it was not an arms-length transaction. 2005 ABQB 656, paras. 25-28 (Can.). The court stated:

> Apex Two is a separate legal person from Apex One. It is therefore a third party to the contract, albeit an associated, non-arm's length corporation. Had Apex intended to exclude non-arm's length transactions from the [right of first refusal] it could have negotiated for such an exclusion. It did not. Accordingly, [the court] conclude[s] that the term "third party" as it appears in the [right of first refusal] includes non-arm's length entities.

*Id.* para. 28.[6]

---

[6] Scoular also cites *Ont. Inc. v. Lenco Inv. Ltd.*, in which the court declined to adopt a landlord's interpretation of the lease because it would "render[] the right afforded to the tenant under the right of first refusal valueless," it would "fail[] to accord any meaning to a key provision of the lease and [would be] inconsistent with the landlord's obligation of good faith dealings with the tenant." 2014 ONCA 903, para. 11 (Can.).

In this case the Court need not find that Riverland is a "third party"; it need only find that Riverland is "a party other than Scoular." If the parties meant to allow for an agreement between Ceres and an affiliate without triggering Scoular's right of first refusal, they could have described the right to apply to "any party other than Scoular or an affiliate."[7] But they did not. This choice is particularly telling in light of the fact that the Term Sheet includes several specific references to Riverland, supporting the idea that at the time of contracting, the parties understood the distinct roles of Ceres, Scoular, and Riverland at Northgate. (*See* Term Sheet at 4 (including a section entitled "Riverland Ag" that states Scoular would give Riverland priority consideration for some deals at Northgate).) Accordingly, the Court finds that the Side Letter means what it says – the right of first refusal is implicated by a deal between Ceres and "any party other than Scoular," including Riverland.

Ceres also argues that an agreement with Riverland would not implicate the right of first refusal based on a later portion of the agreement that allows either party to assign their rights and obligations to "their respective affiliates." (Side Letter at 15.) Ceres argues that, under this provision, Ceres could have assigned its rights to Riverland, and thus, the right of first refusal was not implicated by an agreement between the two parties. The Court finds this argument unpersuasive. Even assuming Ceres could have assigned its rights and obligations to Riverland, that ability would not negate Scoular's

---

[7] Ceres would also have a better argument if the contract stated the right of first refusal applied upon agreement with "any party other than Scoular **or Ceres**" or even "**any third party** other than Scoular."

right to be notified of a deal to operate Northgate. The Side Letter contemplates Ceres as part financer and owner, and Scoular as part financer and operator, and Ceres assigning its role to an affiliate would not allow it to avoid Scoular's rights under the agreement. The Side Letter did not give Ceres a right to operate Northgate, and thus, Ceres assigning its own rights under the contract would not preclude Scoular's claim.

Overall, the Court finds that Scoular's right of first refusal applies to a deal with any party other than Scoular, including Riverland, and therefore, Scoular has alleged a breach of the Side Letter.

## 2. Exclusive Damages Provision

Second, Ceres argues that, even if it breached Scoular's right of first refusal, Scoular waived its right to recover damages by failing to employ the Side Letter's exclusive damages provision.

Ceres relies on a combination of two provisions in the Side Letter to reach this conclusion. Ceres contends that the reimbursement provision found in paragraph 4 of the Side Letter provides a remedy for breach of the Side Letter. Under that provision, Scoular could recover its share of the costs after delivering a Reimbursement Notice "if Ceres constructs or causes to be constructed on the Project Lands any improvement that is substantially inconsistent with the . . . Term Sheet." (*Id.* at 14.)

Ceres then argues that paragraph 7 of the Side Letter, entitled "No Liability for Other's Negligence," renders the reimbursement provision the exclusive source of damages under the contract. (*See id.* at 15.) Paragraph 7 states, "[n]or shall either Party

be liable to the other for costs, expenses, liabilities or damages arising out of a breach of the [mass grading contract] . . . or of this Agreement by such Party." (*Id.* at 15.) Ceres argues that this provision precludes any other damages for breach of the agreement, and therefore, Scoular's sole remedy would have been to follow the reimbursement provision's procedure and submit a Reimbursement Notice, prior to May 31, 2016, to receive its costs. (*See id.* at 14.)

However, Ceres ignores the fact that, if read as to preclude any damages for a breach of the agreement as Ceres proposes, the damages limitation would leave no remedy for breach of the – admittedly binding – right of first refusal. Ceres argues that the damages limitation would not preclude recovery under the reimbursement provision because it describes a specific remedy, rather than purporting to be a remedy for a breach of contract. But the reimbursement provision only addresses reimbursement for specific conduct – allowing recovery only "if Ceres constructs or causes to be constructed on the Project Lands any improvement that is substantially inconsistent with the Green Design and/or the Term Sheet." (*Id.*) Thus, the reimbursement provision does not specifically provide a remedy for a breach of the right of first refusal under Ceres's interpretation.

Scoular offers its own interpretation, arguing that the damages limitation provision in the Side Letter is in fact significantly narrower than Ceres lets on. Scoular notes that it proposed the language for this provision in order to avoid being liable to a third party for Ceres's actions based on its funding of the grading work. (*See* Mulder Decl., Ex. 19.) Scoular contends that the two clauses in the damages limitation contain parallel language, which suggests that the final clause only limits liability by one party for the breach of

another; it does not limit a party's liability for its own breach. Scoular relies on the following parallel language:

> Notwithstanding anything contained herein to the contrary, **no Party** shall be liable to the ***other Party*** for any and all costs, expenses, liabilities and damages arising out of the negligent act or omission or willful misconduct of ***such other Party***; nor shall **either Party** be liable to the ***other*** for costs, expenses, liabilities or damages arising out of a breach of the [mass grading contract] (unless such breach results from an act or omission caused or agreed to by Scoular) or of this Agreement by ***such Party***.

(Side Letter at 15 (emphasis added).) The "other Party" and "such other Party" in the first clause clearly refer to the same party, and Scoular argues that the second clause borrows from the first, using shorthand for the same meaning – the "other" and "such Party" in the second clause both refer to the breaching party. Thus, Scoular views the second clause as similarly limiting damages of one party to the breaching party. Scoular contends that its view is also consistent with the rules of grammar because "such Party" – a backward-looking pronoun – would be placed as close as possible to the noun phrase to which it refers. (*See* Decl. of Peter M. Lancaster, Ex. I at 446, Oct. 21, 2016, Docket No. 136.)

The Court finds that Scoular's proposed interpretation is most consistent with the language of the Side Letter and most adequately gives effect to the right of first refusal. Thus, the Court adopts Scoular's interpretation and finds that, given the context and the document as a whole, the limitation provision does not preclude the harmed party from seeking damages for a breach of contract from the breaching party. Accordingly, the Court will deny Defendants' motion with regard to Scoular's breach of contract claim based on the Side Letter.

### D.    Tortious Interference with Contract

Defendants next seek summary judgment on Scoular's claim against Riverland for tortious interference with contract.  Defendants argue that even if there was a breach of contract, Scoular's tortious interference with contract claim fails because of the parent-subsidiary privilege.[8]   The parties appear to agree that Minnesota law applies to this claim.  Generally, "a party cannot interfere with its own contract."  *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991).   Some courts have extended this principle to establish a parent-subsidiary privilege, under which a parent and wholly owned subsidiary cannot interfere with each other's contracts.  *See, e.g., Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 800-02 (6th Cir. 2007) (finding no tortious interference where parent owned ninety-eight percent of the other company and there was sufficient evidence to pierce the corporate veil).

Overall, the Court finds the law unclear regarding whether a parent-subsidiary privilege exists and would apply in this instance – where a subsidiary is accused of interfering with a contract between its parent and a third party.  Almost all of the cases cited by Defendants apply the privilege to protect a parent's interference with a subsidiary's contract and do not discuss whether the same result would occur if the roles

---

[8] Defendants also argue that Scoular's tortious interference with contract claim fails because there was no breach of contract, for the same reasons discussed in the prior sections. *See Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (stating that intentional procurement of a breach of a contract is required for a tortious interference claim).  As discussed above, the Court finds Defendants are not entitled to summary judgment on Scoular's breach of contract claim, and thus, the Court rejects this argument.

were reversed.  *See Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995) ("Courts in other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."); *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (finding a parent company was privileged to interfere in a contract between a subsidiary and a third party because the parent was "in effect, the same entity" as its subsidiary"); *see also Culcal Stylco, Inc. v. Vornado, Inc.*, 103 Cal. Rptr. 419, 421 (Cal. Ct. App. 1972) (discussing the differing interests a parent and a subsidiary have in each other).[9]

Defendants provide only one case in which a court dismissed a tortious interference claim against a subsidiary – from the Fifth Circuit applying Texas law.  *See Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1197 (5th Cir. 1985) (finding a wholly owned subsidiary did not tortiously interfere with a parent company's contract because the parent controlled the subsidiary's operations and the subsidiary's profits went to the parent, and thus, the parent's and the subsidiary's "interests were so closely aligned that [the court had] difficulty even recognizing their separate identities for

---

[9] Scoular also cites *United States v. R.J. Zavoral & Sons, Inc.*, in which the court found, "Cases recognizing [the parent-subsidiary] privilege . . . are limited to situations where a parent company interferes with a contract of its **wholly owned subsidiary**."  894 F. Supp. 2d 1118, 1128 (D. Minn. 2012).  But considering the context, the court in that case was contrasting the defendant's partial ownership in a joint venture with the wholly owned subsidiaries in prior cases, and thus, the court did not hold that the party whose contract was interfered with must be a subsidiary rather than a parent.  *Id.*  That said, *R.J. Zavoral* may suggest that the privilege does not apply where the interfering party is not the sole owner of the other party.

the purpose of [tortious interference] analysis").[10]  Thus, the Court finds no consensus establishing a subsidiary's privilege to interfere with the contracts of its parent.

Moreover, the rationale behind cases recognizing some form of a parent-subsidiary privilege is not entirely consistent.  Some cases focus on the parent's interest in the subsidiary as justifying its interference, *e.g.*, *James M. King & Assocs., Inc. v. G.D. Van Wagenen Co.*, 717 F. Supp. 667, 680-81 (D. Minn. 1989) (collecting cases and referring to the privilege as "the 'superior financial interest privilege'"), which may not apply as strongly in reverse.  In contrast, other cases have used broader language about the "identity of interests" between a subsidiary and a parent.  *E.g. Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 781-82 (Tenn. 2000).

Due to the underlying rationale for such a privilege and the dearth of caselaw applying a parent-subsidiary privilege in the manner Defendants seek , the Court finds no indication that an absolute privilege exists under Minnesota law preventing a tortious interference claim based on Riverland's alleged interference with Ceres's contract with Scoular.  Because Defendants make no other argument with regard to this claim, the Court will deny Defendants' motion with regard to Scoular's tortious interference with contract claim.

---

[10] Defendants also cite *Starcom, Inc. v. U.S. Telecom, Inc.*, a federal case in which the court extended the privilege to actions between subsidiaries of a common parent.  No. 87-2540-V, 1991 WL 279291, at *3 (D. Kan. Dec. 11, 1991).  The *Starcom* court relied on a Supreme Court case, *Copperweld Corp. v. Independence Tube Corp.*, holding that a parent company and its wholly owned subsidiary were "incapable of conspiring with each other for purposes of § 1 of the Sherman Act."  467 U.S. 752, 777 (1984).  The Court in *Copperweld Corp.*, however, noted that it was reaching only the "narrow issue squarely presented."  *Id.* at 767.

### E. Equitable Claims

Defendants also seek summary judgment on Scoular's equitable claims. The parties agree that Minnesota law applies to these claims.

Defendants first argue that Scoular's claims for unjust enrichment and promissory estoppel fail because there is a valid contract between the parties. "A party may not have equitable relief where there is an adequate remedy at law available." *See Servicemaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996). Under Minnesota law, "[w]here an express contract exists, there can be no implied [in law] contract with respect to the same subject matter." *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995) (quoting *Reese Design v. I-94 Highway 61 Eastview Ctr. P'ship*, 428 N.W.2d 441, 446 (Minn. Ct. App. 1988)). However, "if an existing contract does not address the benefit for which recovery is sought, [equitable relief] is available regarding those items about which the contract is silent." *Id.*

Scoular contends that both of its equitable claims are unrelated to the limited rights provided in the contracts, which involve exclusivity, confidentiality, and the right of first refusal. Instead, the equitable claims are based on Scoular's allegations that Ceres misled it into investing in Northgate, with assurances that Riverland would not be involved in operations and that Scoular would receive a benefit. (*See* Am. Compl. ¶¶ 70-86.) The Court finds Scoular's argument persuasive. Considering the limited scope of the applicable contracts, the Court finds that Scoular's equitable claims are not barred by the existence of several narrow contractual rights.

Defendants also argue Scoular's unjust enrichment claim fails because Scoular has not provided evidence of illegal or unlawful conduct. *See First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981) ("[U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."). But, in addition to illegal or unlawful activity, "[a]n action for unjust enrichment may be based on failure of consideration, fraud, mistake, and situations where it would be morally wrong for one party to enrich himself [or herself] at the expense of another." *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984). In *Anderson*, the court noted that "there was no mistake or fraud by the" defendants, but that they "stood silent and watched [the plaintiff] make extensive improvements to their property" and "contracted to retain those improvements upon default knowing that . . . there was little or no chance [the plaintiff] could perform under the contract." *Id.* Under those circumstances, the court found that a "jury reasonably could find that equity and good conscience require[d] [the defendants] to compensate [the plaintiff] for the improvements." *Id.* In this case, construing the facts in Scoular's favor, one could find that Defendants' misrepresentations and assurances, while Scoular invested time and money into the project, similarly support a finding that in "equity and good conscience," Scoular should be compensated.

Accordingly, the Court rejects Defendants' arguments that Scoular's contractual rights preclude any equitable claims at this stage in the proceedings and that Scoular has

not alleged facts supporting its unjust enrichment claim. The Court therefore will deny Defendants' motion for summary judgment with regard to Scoular's equitable claims.

### F. Lost-Profit Damages

Defendants argue that the Side Letter and Term Sheet prohibit recovery of lost profit damages under both the breach of contract and tortious interference claims.[11] Defendants' arguments rely on the Side Letter's damages limitation provision, which Defendants argue precludes any damages aside from those described in the reimbursement provision. As discussed above, the Court rejects Defendants' construction of the limitation and finds instead that the provision limits damages to the breaching party but does not excuse damages owed by the breaching party. The Court therefore finds that the Side Letter damages limitation does not bar lost profit damages.

Defendants also point to a provision in the Term Sheet, which states, "If for any reason whatsoever the Parties fail to execute the Definitive Agreements, no Party will be entitled to make any claim to the others as a consequence of the failure by the Parties to reach an agreement." (Term Sheet at 6.) The Court finds that this provision only emphasizes the non-binding nature of much of the Term Sheet; it does not disclaim damages under the binding portions of the contract.

Accordingly, the Court will deny Defendants' motion with regard to lost profit damages.

---

[11] Defendants also argue that lost-profit damages are unavailable for an unjust enrichment or promissory estoppel claim, but Scoular agrees and states that it is not seeking lost-profit damages under those claims. Thus, the Court need not consider the argument.

## II. MOTION TO EXCLUDE EXPERT TESTIMONY

Defendants also move to exclude several opinions from Scoular's damages expert, Dr. Timothy Nantell. Nantell is "an emeritus professor of finance at the Carlson School of Management at the University of Minnesota." (Decl. of Dr. Timothy J. Nantell ("Nantell Decl.") ¶ 1, Oct. 21, 2016, Docket No. 138.) Nantell has a Ph.D. in Finance from the University of Wisconsin, and he has previously served as Chair of the Finance Department, Associate Dean of Faculty Affairs, and Acting Dean at Carlson School of Management. (Decl. of Daniel R. Olson ("Olson Decl."), Ex. 1 ¶ 2, Sept. 30, 2016, Docket No. 123.) Nantell has never been employed in the private sector or the grain industry. (Olson Decl., Ex. 3 ("Nantell Dep.") at 9:23-10:1, 10:24-11:1.)[12]

Nantell estimates Scoular's lost profits as $66,777,782. (Olson Decl., Ex. 1 tbl.A.) Nantell arrived at this estimate after "approximately 140 hours of effort reviewing dozens of documents, public information, and deposition testimony, interviewing five members of Scoular's management team, and building almost 300 lines of analysis for ten years across nine tables." (Nantell Decl. ¶ 4.) Nantell also reviewed "multiple financial models developed by Scoular as part of its normal business analysis," including the final model developed by Scoular in November 2013, which "contained around 40 analysis

---

[12] Defendants note that Nantell's testimony was excluded from trial at least one time in a past case, but the exclusion was based on the court's rejection of one of the underlying legal theories. (Nantell Dep. at 16:17-17:14); *see Hexamedics, S.A.R.L. v. Guidant Corp.*, No. 00-2532, 2003 WL 21012179, at *5 (D. Minn. Apr. 30, 2003) (finding "the model [used in Nantell's expert report] d[id] not fit the facts of t[he] case" because it included an assumption based on a claim that the court dismissed on summary judgment). Nantell has been retained as an expert more than fifty times over forty-five years. (Nantell Dep. at 15:5-10, 16:4-9.)

sheets (Excel worksheets) covering roughly ten years and often running to dozens of lines of analysis." (*Id.*)

Defendants note that Nantell relies on several assumptions, including: Scoular's board would have approved the $47.3 million investment into Northgate in 2014; Northgate would have started to generate Earnings Before Income Taxes, Depreciation, and Amortization ("EBITDA") of $9.2 million in 2016; Northgate would operate at full capacity by 2018; and Scoular would have continued to invest in GrainCo and would have increased its ownership share over time. (*See* Olson Decl., Ex. 1 ¶ 104.) Nantell explicitly acknowledges these assumptions in his report. (*Id.*) Scoular also notes that Nantell's estimate of EBITDA between $9 and $16 million is lower than Ceres's internal calculation of over $16 million. (*Compare id.* tbl.B, *with* Olson Decl., Ex. 2 ¶¶ 32-33.)

Defendants note there is a significant difference between Nantell's projections and some of Scoular's internal projections. Scoular's last internal projections anticipated a loss of between $2.145 and $9.5 million. (*See* Nantell Dep. at 118:4-11.) Nantell later directed Scoular to update and add to the figures underlying those projections. (*Id.* at 27:11-28:18; Olson Decl., Exs. 6, 7.) Scoular contends that the difference in estimates make sense because Scoular's prior internal estimates did not account for the entire value of the deal. (Nantell Dep. at 118:4-18 (stating that Scoular's internal projections were "not intended to be anywhere near a complete accounting of [Northgate's] strategic

value"); *id.* at 154:14-20 (stating Scoular's internal projections "were not estimating the complete value"); *see also* Nantell Decl. ¶¶ 7, 10.)[13]

Finally, Nantell acknowledges that he did not consider Northgate's actual performance, under Ceres's management, to reach his opinions, reasoning that this information was not relevant to calculate Scoular's damages because Northgate "wasn't being run by Scoular." (Nantell Dep. at 24:18-25:22.)

## A. Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[13] According to Nantell, the Northgate deal involved two components: (1) "the Origination component, which referred to the business opportunity located at Northgate due to originating the flow of grain from Canada to Scoular," and (2) "the Strategic component, which referred to the business opportunities 'downstream' from the Northgate location" such as "all of the ways in which Scoular . . . would be able to use the originated grain . . . to add value to the company's distribution network." (Nantell Decl. ¶ 5.) Nantell contends that the origination component mainly involved "identify[ing] the magnitude of the investment required to reach the purpose for which the investment was undertaken: the value of the Strategic component." (*Id.* ¶ 7.) According to Nantell, Scoular's internal models included only the origination component because Scoular "had become increasingly comfortable" in thinking that the strategic value would greatly outweigh the investment required for the origination component. (*Id.* ¶ 8.) Additionally, "[b]ecause Scoular is not a public company, it fe[lt] no need to try to provide the public complete projections of the value of its investments. Instead, its analysis [was] for internal purposes alone, and primarily constitute[d] a simple go/no-go analysis." (*Id.* ¶ 9.) A January 2013 email from Ludington supports this conclusion: Ludington stated that in its internal projections, Scoular had not fully projected "growth in strategic value" and that "there [were] numerous strategic value components that [Scoular] ha[d] not factored in." (Lancaster Decl., Ex. H at 196.)

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006).  The reliability and relevance inquiry is "designed to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Id.* at 757 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

"[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire*, 526 U.S. at 152.  However, the Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Marmo*, 457 F.3d at 758.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Loudermill v. Dow*

*Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

### B.     Reliance on Scoular's Projections

Defendants first argue that Nantell's opinions should be excluded because he failed to independently test some of the data provided by Scoular, which they argue renders Nantell's opinions unreliable. Defendants point to three particular sets of facts or data for which Nantell relied on Scoular's representations: (1) grain volume projections, (2) margin estimates, and (3) BNSF Railway Company ("BNSF") development funds.

First, Defendants note that Nantell admitted in his deposition that he did not "independently research or analyze" the grain volume projections, and that "in the end these are the estimates from the experts within Scoular." (Nantell Dep. at 113:2-12.) But Nantell did "set the standards [Scoular would] use[] in terms of how conservative they should be" and also "discussed the sources and the basis of [the grain volume projections] with them." (*Id.* at 113:7-10.) Defendants contend that this is worrisome because Scoular's grain volume projections were higher than those reflected in contemporaneous documents, based on the inclusion of two commodities not previously contemplated by the parties. (*See id.* at 111:23-112:4.) Also, Defendants contend that the projections conflict with changes in market conditions, including the decrease in

Saskatchewan's grain production since the time of the projections. (*See id.* at 112:21-113:1.)

Second, Nantell relied on Scoular's representations regarding margin estimates. Defendants argue that Scoular's margin estimates derive from a different region in Canada, and that Nantell failed to conduct any independent analysis into whether the margins would be comparable between the regions. (*See id.* at 115:21-116:11 (acknowledging that different regions would not necessarily have the same margin); *id.* at 117:5-8, 126:23-127:9 (admitting that he relied on Scoular's margin estimates, but noting that he provided parameters for how conservative they should be).) Defendants asked specifically about one projection regarding durum wheat, which seemed in conflict with the actual loss in the prior year. (*Id.* at 127:10-128:4.) Defendants asked whether that perceived inconsistency prompted Nantell to "probe at all any of the other margins," to which Nantell responded that he had conversations with Scoular personnel about the durum wheat projection, but determined that the prior year had been unique because "there were some fraud issues." (*Id.* at 128:5-15.) Nantell specifically considered whether the prior year's loss had reflected a change in "the long-term estimates for the margins in this business[,] and after some discussion[, he] was satisfied that it hadn't." (*Id.*)

Finally, Nantell accepted Scoular's representation that BNSF would waive a requirement that a facility be built by a certain date and would pay $7.5 million in development funds even if the project was delayed by a few months. (*Id.* at 179:2-21.) Nantell admitted that he took Scoular's word that its "working relationship" with BNSF

meant that Scoular was legitimately unconcerned that BNSF would strictly enforce that part of the agreement over just a few months of delay. (*Id.* at 179:7-180:6.)

Defendants contrast Nantell's acceptance of Scoular's figures on these issue with his rejection of some of Scoular's other forecasts or models, including Scoular's discount rate and working capital. (*Id.* at 123:25-124:9.) But the fact that Nantell did not accept all of Scoular's data and figures suggests that he was considering the validity of Scoular's data and rejecting that which he found unsupported. Nantell also states that he had reasons for trusting Scoular's estimates, including the following: Nantell found Scoular had a "history of conservative estimates"; Nantell encouraged Scoular's personnel to perform their analysis to a standard "consistent with [Nantell's] goal of setting an estimate of damages to a reasonable degree of professional certainty," and interviewed them to ensure they did so; and Nantell confirmed Scoular's volume estimates by comparing them to prior estimates by Scoular and Defendants. (Nantell Decl. ¶ 11.)

Defendants argue that Nantell's reliance on Scoular's projections without independent verification renders Nantell's opinions unreliable. Reliance on internal documents or projections does not render an expert opinion per se unreliable. *Cf. Supervalu, Inc. v. Associated Grocers, Inc.*, No. 04-2936, 2007 WL 624342, at *6 (D. Minn. Jan. 3, 2007) ("Expert witnesses routinely rely on financial and accounting information provided by parties in support of their analysis."). The question is whether the internal projections that Nantell relied upon provide a reasonable factual basis for his opinions. *US Salt, Inc. v. Broken Arrow, Inc.*, No. 07-1988, 2008 WL 2277602, at *1 (D. Minn. May 30, 2008). ("Although the law does not require mathematical certainty in

the proof and calculation of lost profits, it requires evidence of definite profits grounded upon a reasonable factual basis.").

Both parties discuss *US Salt*, in which the court excluded expert testimony on lost profits, finding the testimony unreliable because the expert could not "identify a reliable factual basis for his opinions." 2008 WL 2277602, at *2. In that case, the expert "relied almost exclusively on the assumptions and estimates provided by U.S. Salt's president and owner" and "did nothing to investigate the market conditions . . . or verify the estimates in his reports despite the fact that U.S. Salt's sales projections and goals were based on vague and speculative information." *Id.* at *1. The expert did not know who had prepared the documents he relied upon and never talked with that person about the documents. *Id.* at *2. The court found that the expert "ha[d] not formed an opinion as to U.S. Salt's lost profits," but rather "he ha[d] simply adopted [U.S. Salt's owner's] opinion as to U.S. Salt's expected sales and the nature of the market." *Id.* Finally, the court's finding that the underlying projections were "speculative at best" and "nothing more than optimistic projections" also likely played a role in its decision. *See id.* at *1-2.

As in *US Salt*, reliance on internal estimates or projections may not be reasonable where the underlying projections are suspect or the expert does not make an effort to consider their reliability. 2008 WL 2277602, at *1-2. But in this case, Nantell conversed with Scoular personnel about the data and methods they employed, he challenged data provided by Scoular when he felt it necessary, and he gave supporting reasons for his decision to trust the particular data he relied upon. Based on this evidence, the Court finds Nantell's reliance on Scoular's data and representations does not render his

opinions unreliable.  Defendants may still raise challenges to the factual basis of Nantell's opinions on cross-examination, as these challenges go to credibility rather than admissibility.

### C.     Reliance on November 2013 Proposed Term Sheet

Defendants challenge Nantell's decision to use in his report terms collected from various draft agreements and communications, rather than relying solely on the Term Sheet, Term Sheet Addendum, and Side Letter, which were executed by both parties. Specifically, Defendants challenge Nantell's decision to include some terms from the November 2013 Addendum, which Ceres never signed.  (*See* Nantell Dep. at 38:1-9, 163:10-15; Olson Decl., Exs. 4, 5.)  When asked whether he "picked and chose from various documents and compiled what [he] believed to be what the parties' agreements were with respect to Northgate," Nantell responded that he understood his "job as an expert [was] to look at the mounds of data and say what needs to be gathered . . . to produce a reasonable estimate of damages."  (Nantell Dep. at 169:16-170:7.)

Defendants contend that Nantell's discussion based on hypothetical terms never agreed to by both parties renders Nantell's opinions unrelated to the facts and, therefore, Defendants contend they should be excluded as irrelevant under *Daubert*.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation omitted)); *see also Grp. Health Plan, Inc. v. Philip Morris Inc.*, 188 F. Supp. 2d 1122, 1134 (D. Minn. 2002) (finding an expert's

"causation and damages model [was] precariously built on a foundation of assumptions and speculation").

In this case, however, the duty Ceres supposedly breached was to respect Scoular's right of first refusal and right to exclusivity. Nantell was tasked with determining the value of the lost opportunity, where both parties agree that they never reached a full binding agreement on the terms of their deal, and the terms in the Term Sheet and Term Sheet Addendum were incomplete. Thus, Nantell was not bound to the tentative terms discussed in those documents. While Ceres never signed the November 2013 Addendum, Ceres was involved in negotiating its terms and there is some indication that Ceres almost signed it or would have signed it if Ceres had not decided to explore using Riverland in place of Scoular. (*See* Lancaster Decl., Ex. H at 112 (stating, in an email from Ludington to Detlefsen: "I realized neither of us signed these agreements last week," which implies that the parties had previously discussed and possibly agreed on the terms).)

Accordingly, the Court will deny Defendants' motion because Nantell's opinion about the deal the parties likely would have agreed to, based on a review of many documents in this case, is not irrelevant.

### D.    Determination of Lost Profits into the Future

Finally, Defendants challenge Nantell's lost profit analysis as too speculative because it considers lost profits many years into the future. Under Nantell's analysis, the majority of Scoular's lost profits would not occur until 2025, when Nantell projected that

Scoular would have earned $57.875 million. (Olson Decl., Ex. 1 tbl.A.) Scoular contends that Nantell's analysis is consistent with the deal the parties contemplated, which they intended to be long term. (*See* Lancaster Decl., Ex. E at 24:17-25:4 (Ludington stating Scoular's operation of Northgate "would have been . . . in the forever category in terms of time. If we were going to build a business around a grain asset, we want to be there forever. It becomes a part of our network").)

Defendants contend that Nantell's estimate for lost profit damages is too speculative to be reliable because it is based on a new project. *See Hammann v. 1-800 Ideas.com, Inc.*, 455 F. Supp. 2d 942, 948 (D. Minn. 2006) ("Damages for lost profits, especially for a relatively new business venture, must be supported by specific, concrete evidence, not by mere 'speculation and conjecture.'" (citation omitted)). Defendants cite *Leoni v. Bemis Co.*, in which the Minnesota Supreme Court noted that often "proof of loss of profits in a new business is too speculative to be the basis for recovery," 255 N.W.2d 824, 826 (Minn. 1977) (quoting *Village of Elbow Lake v. Otter Tail Power Co.*, 160 N.W.2d 571, 574 (Minn. 1968)), due to "the fact that, lacking a history of profits, new businesses rarely have evidence upon which an award of damages may be based with the requisite degree of certainty," *id.* The *Leoni* court noted, however, that while "it is more difficult to prove loss of prospective profits to a new business than to an established one, the law does not hold that it may not be done"; rather, the general rule that one can recover "so long as there is proof of a reasonable basis upon which to approximate the amount" controls. *Id.* at 826. Applying this rule, the court awarded lost-profit damages in the context of a relatively new operation in a specific region based on

the plaintiff's brief history of initial sales in the region and his successful sales record from other parts of the country. *Id.*

Some courts have also excluded damages analyses where the expert projected damages far into the future when there was no indication the parties contemplated that the contract or relationship would extend for such a duration. *See Cole v. Homier Distrib. Co.*, 599 F.3d 856, 866 (8th Cir. 2010) (finding that "lost-profit damages cannot rest upon mere speculation" and affirming an expert's exclusion where the expert's twenty-five-year damage term was speculative because the parties could terminate the contract with ninety-days' notice and there was no indication it would continue for twenty-five years); *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (affirming exclusion of expert where the expert extended a two-year contract out ten years and assumed exclusivity where it was not guaranteed).

The cases Defendants cite, however, are factually distinct from this one. Here, the Northgate project was meant to last for a long period, with significant investment and a long-term payoff. And like the new regional operation in *Leoni*, while the Northgate project would have been new, Scoular has similar projects and networks elsewhere in the country on which Nantell could rely. The Court finds Nantell's damages opinion is sufficiently grounded in the facts of the case to be helpful to the jury, and therefore, the Court will deny Defendants' motion.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion to Exclude Expert Testimony [Docket No. 120] is **DENIED**.

2.      Defendants' Motion for Summary Judgment [Docket No. 125] is **DENIED**.


DATED:  August 16, 2017                     _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                             JOHN R. TUNHEIM
                                                              Chief Judge
                                                 United States District Court